## ST. LOUIS S. W. RY. CO. OF TEXAS v. GRIFFIN.

(Court of Civil Appeals of Texas. San Antonio. Feb. 12, 1913. Rehearing Denied March 12, 1913.)

1. CONSTITUTIONAL LAW (§ 90*)—MASTER AND SERVANT (§ 11*) — FREEDOM OF SPEECH — BLACKLISTING STATUTE — SERVICE LETTERS TO DISCHARGED EMPLOYÉS.

The Blacklisting Statute (Acts 31st Leg. c. 89), requiring a corporation to give its discharged employés service letters stating the true reasons for their discharge, does not deny to corporations freedom· of speech in violation of Const. art. 1, § 8.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 172; Dec. Dig. §.90;* Master and Servant, Dec. Dig. § 11.*]

2. CONSTITUTIONAL LAW (§ 275*)—DUE PROCESS OF LAW — BLACKLISTING STATUTE — SERVICE LETTERS TO DISCHARGED EMPLOYÉS.

The Blacklisting Statute (Acts 31st Leg. c. 89), requiring a corporation to give service letters to discharged employés stating the true reasons for their discharge, does not contravene the due process of law provision of Const. Bill of Rights, § 19, or Const. U. S. Amend. 14, but is a reasonable regulation, and its subject is one proper to be dealt with under the police power of the state.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 830, 835, 839, 843–846; Dec. Dig. § 275.*]

3. CONSTITUTIONAL LAW (§ 238*)—EQUAL PROTECTION OF LAWS—BLACKLISTING STATUTE—SERVICE LETTERS TO DISCHARGED EMPLOYÉS.

The Blacklisting Statute (Acts· 31st Leg. c. 89), does not deprive corporations of the equal protection of the laws in violation of the state or federal Constitution, though it requires something to be done which the individual employer is not required to do; it being proper in matters of legislation to deal with corporations as a class to themselves, and corporations having a right to exact an equality of legislation only as between themselves.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 688–699, 706–708; Dec. Dig. § 238.*]

4. SEARCHES AND SEIZURES (§ 7*)—UNREASONABLENESS—BLACKLISTING STATUTE.

The Blacklisting Statute (Acts 31st Leg. c. 89) is not violative of the provisions of the state and federal Constitutions in regard to unreasonable searches and seizures.

[Ed.· Note.—For other cases, see Searches and Seizures, Cent. Dig. § 5; Dec. Dig. § 7.*]

5. MASTER AND SERVANT (§ 32*)—BLACKLISTING STATUTE—LIABILITY FOR FALSE STATEMENT.

A railroad corporation is not excused from liability for making false statements in a service letter given under the Blacklisting Statute (Acts 31st Leg. c. 89) on the ground that such statements are privileged.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 38; Dec. Dig. § 32.*]

6. MASTER AND SERVANT (§ 32*)—BLACKLISTING STATUTE—"TRUE STATEMENT."

By the term "true statement," as used in the Blacklisting Statute (Acts 31st Leg. c. 89), requiring a corporation to furnish to a discharged employé a service letter containing a true statement of the cause of his discharge, is meant that the employer shall fairly, honestly, and in good faith state the grounds or cause of ·discharge.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 38; Dec. Dig. § 32.*]

7. MASTER AND SERVANT (§ 40*)—BLACKLISTING STATUTE—ACTION FOR DAMAGES—SUFFICIENCY OF EVIDENCE.

Evidence, in an employé's action for damages for failure of the employer to issue him a true statement of the reasons for his discharge, as required by the Blacklisting Statute (Acts 31st Leg. c. 89), held to sustain a finding that the statement given plaintiff, which alleged that he was discharged for not properly doing his work, was untrue, and was not made fairly, honestly, and in good faith.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 47–49; Dec. Dig. § 40.*]

Appeal from District Court, Dallas County; Kenneth Foree, Judge.

Action by Thomas A. Griffin against the St. Louis Southwestern Railway Company of Texas. From a judgment for plaintiff, defendant appeals. Affirmed.

E. B. Perkins, J. E. Gilbert, and D. Upthegrove, all of Dallas, for appellant. Wm. H. Clark and W. T. Strange, both of Dallas, for appellee.

MOURSUND, J. Thomas A. Griffin, appellee, sued the St. Louis Southwestern Railway Company, of Texas, appellant, to recover damages for its alleged failure and refusal to issue him a true statement of the reasons why he was discharged by appellant; he having made demand for such statement under chapter 89, p. 160, General Laws of Texas of 1909, commonly known as the "Blacklisting Law." On May 9, 1910, appellee was employed as a section foreman by appellant, and on July 18, 1910, was discharged, whereupon he made his demand for a statement in writing as to the cause of his discharge. Appellant issued a service letter, as follows: "This is to certify that Thomas A. Griffin has been employed in the capacity of section foreman at Renner on the St. Louis Southwestern Railway Company of Texas from May 9, 1910, to July 18, 1910. Discharged for not distributing work properly and inability to surface and line track. Previous record, March 25, 1910, to April 1, 1910, assistant extra gang foreman. Resigned. Services satisfactory." Appellee alleged that this statement was false and malicious, that he had had several years' experience on section work and as section foreman, performing and directing said work, was capable, experienced, anl skilled therein; that he could and did distribute his work properly, and could and did surface and line track; that the real cause of his discharge was on account of a personal difference which he had on July 10, 1910, with appellant's general roadmaster, J. J. Hughes. Appellant attacked the constitutionality of the Blacklisting Law, both by demurrer and plea, and alleged that it in good faith attempted to comply with said statute, and that the reasons stated in said service letter were the· true reasons for appellee's discharge; that its assistant roadmaster, in making the re-

port on which said letter was based, acted in good faith in an effort to perform his duty to appellant, and it would not be liable for a mistake in judgment made by its roadmaster. Appellant further alleged that it did not make such letter public, but furnished it to appellee in compliance with said statute, at his request, and without any malice, ill will, or evil intent towards appellee; that it had the right to exercise and act upon its own judgment as to the competency of those employed as section foremen, and if a mistake should be made in the discharge of such employé it would not be liable to him; that it was required by law to keep its track in proper condition for the operation of its trains; that it was necessary to employ careful and competent section foremen to keep the track in proper repair; that other railroad companies had a like interest in keeping their tracks and roadbed in repair; and that such communication was privileged, and, there being no malice, ill will, or evil intent shown, plaintiff could not recover. Defendant's exceptions were overruled, and upon trial the jury found that the statement furnished was false, and awarded plaintiff $500 damages. Judgment was entered for said amount, from which defendant appealed.

Assignments 1 and 3 raise the issues whether the Blacklisting Law is in violation of and repugnant to the following provisions of the Constitution of the United States and of the state of Texas: (1) The fifth amendment to the Constitution of the United States, wherein it is provided "that no person shall be deprived of life, liberty or property without due process of law." (2) The fourteenth amendment to said Constitution, wherein it is provided "that no state shall make or enforce any law which abridges the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the law. (3) Section 19 of article 1 of the Constitution of the state of Texas, which provides "that no citizen of this state shall be deprived of life, liberty, property, privileges and immunities, except by due course of the law of the land. (4) The fourth amendment to the Constitution of the United States, wherein it provides that "the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated." (5) The first amendment to the Constitution of the United States prohibiting the enactment of any law abridging the freedom of speech or of the press. (6) Article 1 of the Constitution of the state of Texas, which provides "that every person shall be at liberty to speak, write or publish his opinions on any subject."

Sections 3 and 4 of article 594, Revised Statutes of 1911, relating to blacklisting, read as follows:

"Sec. 3. Where any corporation, or receiver of the same, doing business in this state, or any agent or employé of such corporation or receiver, shall have discharged an employé, and such employé demands a statement in writing of the cause of his discharge, and such corporation, receiver, agent or employé thereof fails to furnish a true statement of the same to such discharged employé, within ten days after such demand, or where any corporation or receiver of the same, or any officer or agent of such corporation or receiver shall fail, within ten days after written demand for the same, to furnish to any employé voluntarily leaving the service of such corporation or receiver, a statement in writing that such employé did leave such service voluntarily, or where any corporation or receiver of the same, doing business within this state, shall fail to show in any statement under the provision of this title the number of years and months during which such employé was in the service of said corporation or receiver in each and every separate capacity or position in which he was employed, and whether his services were satisfactory in each such capacity or not, or where any such corporation or receiver shall fail within ten days after written demand for the same to furnish to any such employé a true copy of the statement originally given to such employé for his use in case he shall have lost or is otherwise deprived of the use of the said original statement.

"Sec. 4. Where any corporation, or receiver of same, doing business in this state, or any agent or officer of the same, shall have received any request, notice or communication, either in writing or otherwise, from any person, company or corporation, preventing, or calculated to prevent, the employment of a person seeking employment, and shall fail to furnish to such person seeking employment, within ten days after a demand in writing therefor, a true statement of such request, notice or communication, and, if in writing, a true copy of same, and, if otherwise than in writing, a true statement thereof, and a true interpretation of its meaning, and the names and addresses of the persons, company or corporation furnishing the same."

Other articles provide that any discrimination mentioned in the title is prohibited and declared illegal, and shall subject the defender to the payment of a penalty, but also provide that if a true statement is given it shall never be used as the cause of an action for libel, either civil or criminal, against the agent, company, or corporation so furnishing same.

[1] Appellants apparently rely most strongly upon the theory that said section 3 violates the Constitution of the state of Texas by curtailing the freedom of speech. In sup-

port of this contention, we are cited to several cases from other states, among them that of Ex parte Harrison, 212 Mo. 88, 110 S. W. 709, 126 Am. St. Rep. 557, 15 Ann. Cas. 1, by the Supreme Court of Missouri; but we do not consider said case in point because the law therein considered, in addition to providing that printed reports regarding qualifications of candidates should give the information upon which the report was based as well as the names of the persons furnishing such information, absolutely prohibits the publication of any report unless it contains such information. The publication in question was held to be neither blasphemous, seditious, obscene, or defamatory, and the court said that a law prohibiting its publication, except upon the expensive condition of including the additional information mentioned, was in violation of the Constitution of the state of Missouri.

Another case is that of Wallace v. Railway, 94 Ga. 732, 22 S. E. 579, in which the court held a law, similar to the one now being considered by us, to be unconstitutional because in violation of a constitutional provision similar to ours; the court stating that such a statute is violative of the general private right of silence, enjoyed in such state by all persons, natural or artificial, from time immemorial, and was utterly void and of no effect. The court also used the following expression: "Liberty of speech and of writing is secured by the Constitution, and incident thereto is the correlative liberty of silence, no less important or less sacred." It appears that Georgia, in 1895, adopted a law containing a provision substantially the same as section No. 5 of our law, hereinbefore set out. 4 L. R. A. (N. S.) 1097. We are not advised whether the courts have passed upon the constitutionality of said provision adopted in 1895, but presume it has not been held unconstitutional or else the editor of L. R. A. would have called attention to the fact. The Supreme Court of Kansas, passing upon a similar statute in the case of A., T. & S. F. Ry. Co. v. Brown, 80 Kan. 312, 102 Pac. 459, 23 L. R. A. (N. S.) 247, 133 Am. St. Rep. 213, 18 Ann. Cas. 346, followed the Georgia case, and the court used the following language: "Again, is not the freedom to remain silent, to neither write nor publish anything on a certain subject, involved as an element in the guaranteed right to 'freely speak, write or publish their sentiments on all subjects, being responsible for the abuse of such rights'? It would seem that the liberty to remain silent is correlative to the freedom to speak. If one must speak, he cannot be said to freely speak."

The two last-mentioned cases had been decided before the question of the constitutionality of our law was considered by the Court of Civil Appeals of the Fifth district, in the case of Railway v. Hixon, 126 S. W. 338, and the court, after discussing the same, held our law constitutional. Our Supreme Court granted a writ of error in the Hixon Case, but found it unnecessary, in disposing of the case, and probably unwise, to pass upon the constitutionality of the law, although recognizing the question to be of far-reaching importance.

Section 8, art. 1, of the Bill of Rights, reads as follows: "Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press. In prosecutions for the publication of papers investigating the conduct of officers, or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence. And in all indictments for libels, the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases."

At common law actions for slander and libel existed. By our statutes both criminal and civil libel have been defined, and slander by orally or otherwise falsely and maliciously, or falsely and wantonly, imputing a want of chastity to a female, was in 1879 made a criminal offense. Our criminal libel law was held constitutional in the case of Morton v. State, 3 Tex. App. 516. In the case of Hatcher v. Range, 98 Tex. 85, 81 S. W. 289, our Supreme Court has held that, since the enactment of the slander statute above mentioned, to impute a want of chastity to a female is actionable per se, though prior to its enactment, following the common-law rule, it was held that special damages would have to be shown before an action would lie. In the case of Walker v. Light Pub. Co., 30 Tex. Civ. App. 169, 70 S. W. 558, the court, in speaking of our civil libel law, said: "We are of the opinion that it was the manifest purpose of the Legislature, in enacting the statute quoted, to cover the entire subject of libel as applied to civil suits, regardless of what may have been the rules of common law and decisions of the courts on the subject."

Abuses of freedom of speech are not limited to actions of libel or slander, but also include statements constituting false and fraudulent representations, which may lead to the injury of the property rights of another. So, the right of silence is not an absolute one, as "a duty to speak, which is the ground of liability, arises wherever and only where silence can be considered as having an active property, that of misleading." Bigelow on Fraud, p. 597.

Modern business conditions are such that by means of corporations vast business enterprises are carried on requiring the employment of many persons, and having many different details, the proper attention to which is necessary for the success of the business. The execution of these details requires in many instances special knowledge and qualifications. When a man has qualified him-

self for a particular avocation, if he be deprived of the privilege of exercising such avocation, great injury is inflicted upon him and those dependent upon him. When customs have grown up which permit this to be accomplished unjustly, it becomes necessary for the Legislature to take steps for the protection of the large portion of its citizens whose rights are jeopardized by such customs.

Our Legislature, in the law now being considered, sought to prevent such injustice. Section 4 of the law prevents secrecy by providing that, if any information is given to any corporation calculated to prevent any person from getting employment, such corporation shall upon demand furnish the employé with a copy thereof. Section 5 provides that, after failing to give an employé a statement of the cause of his discharge, it shall be unlawful to furnish such information to some other corporation. But these provisions alone would be ineffective under the customs which have grown up. Corporations, having inaugurated a custom to furnish other corporations with information concerning their ex-employés, would, of course, decline to give information after refusing the employé a statement; but such refusal would of itself be sufficient to apprise the other corporation of the fact that the first corporation had declined to give the employé a statement. Under such circumstances, it would naturally be inferred that the employé had severed his connection with his employer under circumstances reflecting discredit upon him. If he be discharged because of dislike of him by one of his superiors, the impression nevertheless would prevail that he had been discharged for adequate cause. The failure to give a statement, taken in connection with the customs, may amount to a misrepresentation as injurious as a spoken or written misrepresentation. In addition, it may be more unjust than a written or verbal misrepresentation because the employé will not know what to meet, while he would have a chance to disprove a false statement brought to his knowledge. Section 3 meets this objection by requiring the corporation upon written demand to furnish a true statement, in writing, of the reasons for his discharge, or, if he voluntarily left its service, then a statement to that effect. This prevents silence in those cases in which silence would amount to a misrepresentation, and of course prohibits an active misrepresentation by requiring the truth. When the true cause is given, no matter how injurious the statement may be, no liability attaches. If freedom of silence be a necessary correlative of freedom of speech, then, the freedom of speech being subject to abuse, the freedom of silence may also be subject to abuse, as shown by cases of fraud. The Legislature may enact statutes preventing abuse of the freedom of speech, and the necessary correlative follows that it may enact laws preventing the abuse of the freedom of silence.

In the case of Morton v. State, supra, the court, in discussing the criminal libel law, said: "But the exercise of a right is essentially different from an abuse of it. The one is no legitimate inference from the other. Common sense here promulgates the broad doctrine, 'sic utere tuo ut non alienum lædas—so exercise your own freedom as not to infringe the rights of others or the public peace and safety.' Story on Const. § 1881."

We hold that the law being considered is not in violation of the constitutional guaranty of freedom of speech.

[2] The next contention earnestly presented by appellant is that the law contravenes the nineteenth section of the Bill of Rights of the Constitution of Texas, and the fourteenth amendment to the Constitution of the United States, in that it deprives appellant of privileges, liberty, and property without due process of law. Appellant says that the giving of a service letter is a part and parcel of the contract of employment and discharge of employés, that such contract is a private contract, and one which the Legislature cannot interfere with. It is to be borne in mind that this law does not interfere with the employer's right to employ and discharge as he pleases, for any or no reason, but merely requires, after the relation has terminated, that upon demand a true statement be furnished of the reason for the severance of the relation of employer and employé. Appellant says that the law means that the railroad company is required to speak the truth as the jury afterwards finds the truth to be; that if the cause is not stated in accordance with the opinion of the 12 jurors the company is held liable. We must assume that if the railroad company states the truth it will have some evidence to substantiate its statement. It is true that if there is a conflict the jury can pass upon the weight to be given to the evidence, and it is also true that the jury may err and accept testimony as true which is untrue and perpetrate injustice; but the same may be said of any law under which facts are submitted to a jury. There must be some tribunal to pass upon the truth or falsity of the statement, and, when the matter is determined as all other matters of litigation, appellant cannot be heard to complain. It is also to be borne in mind that appellant is not required to try an employé before discharging him, and state its conclusion as to his guilt or innocence in his service letter. It can discharge for no cause whatever, and, if it discharges a man upon receipt of information or evidence that he has indulged in intoxicants, it is not necessary that it should state that he was drunk. So, again, if it receives information that an engineer failed to sound the whistle at a crossing, it need not state that he failed to sound the

whistle. In either event, the statement can be based upon the actual knowledge or information possessed.

However, to the extent that it adds to every contract between a corporation employer and the employés a clause entitling the latter to a service letter stating the true reason for the termination of the contract between them, it may be said that the law interferes with the liberty of the corporation to make contracts with respect to its business. While it would ordinarily appear that corporations would be subject to restrictions that an individual would be free from, yet, in so far as the fourteenth amendment is concerned, a corporation has been ruled by the Supreme Court of the United States to be a person. Nevertheless, every interference with the right of contract is not interdicted, and we think there is authority for upholding this statute without justifying the same upon the ground that it is a legitimate exercise of the police power. Knoxville Iron Co. v. Harbison, 183 U. S. 15, 22 Sup. Ct. 1, 46 L. Ed. 55. We are also of the opinion that under the authority of the case just cited, as well as the decisions of our Supreme Court, the law can be sustained as a valid exercise of the police power. The latest utterance we find on this subject is the opinion in the case of Nash Hardware Co. v. Morris, 146 S. W. 874, involving the constitutionality of article 3971, Revised Statutes of 1911, known as the "Bulk Sales Law," which provides that, in addition to a purchaser of merchandise in bulk being required to procure from the seller a sworn list of his creditors, he must notify, in writing, each of such creditors of his intention to purchase said stock of goods. The court held said act to be a reasonable exercise of the police power of the state, and after quoting with approval the definition given by Judge Cooley, in his work on Constitutional Limitations ([5th Ed.] p. 706), said: "Men are, individually, largely interested in and dependent upon the success or failure of others; and the public are interested in the protection of the rights of individuals and the prevention of frauds in the transaction of the business of the country. The Legislature may, in the exercise of police power, regulate by reasonable requirements the business transactions of the citizens. Railway Co. v. Dallas, 98 Tex. 396, 84 S. W. 648, 70 L. R. A. 850." The court took judicial notice of the fact that litigation frequently resulted because of fraudulent conveyances, and the protection afforded to creditors under the former laws was inadequate, and concluded there were sound reasons why the Legislature should adopt some regulations by which fraud might be prevented The court said, also: "The masses, the consumers of goods, the public, are brought into contact with the retail dealers, and thus the public are interested in their solvency and character; therefore the provisions which prevent fraud is of interest to the people at large. The opportunity for fraudulent sales of their stock by retail debtors necessarily has the effect to discredit the class, and cause more stringent rules of credit and collection to be adopted. It is especially hurtful to the one with little means, who has not made a reputation for fair dealing. The effective preventive which this law provides will give more confidence to the trade, to the advantage of the retail dealer, and to the public."

In this case we consider the rights of a very large part of our population, and, in so far as the employés of public service corporations are concerned, a portion of our population upon whose services in their avocations the public generally depends largely for conveniences and privileges. To prevent dissatisfaction among such employés by reason of injustice in the nature of the fraudulent prevention of their plying their avocation is a matter of deep concern to the public generally. In all contests between such employés and their employers, the public, as a general rule, suffers equally with the participants in the struggle. Appellant, in its brief, states that in 1908 there were nearly 60,000 railroad employés in Texas. This class of employés alone constitutes a considerable portion of our population, to say nothing of the many other employés of corporations, and this law, while designed primarily to protect the employé from injury in the nature of a fraudulent deprivation of his avocation, inures to the benefit of the public generally by protecting desirable employés in the pursuit of their avocation, and the more efficient the employés are who serve public service corporations, the more safely and efficiently will the public be served. Laws requiring all corporations to pay their employés their wages semimonthly have been upheld as a legitimate exercise of the police power in several of the states. State v. Railway Co., 242 Mo. 339, 147 S. W. 118, and cases therein cited.

The law now being considered "is intended and well calculated to promote peace and good order, and to prevent strife" between employés and those organizations of labor authorized to be incorporated under the Acts of 1899, p. 262. We believe that, under the opinion of our Supreme Court, we are not only authorized but required to hold that the Blacklisting Law deals with a subject proper to be dealt with under the police power, and we have already expressed our opinion that it is not an unreasonable regulation in so far as it requires the service letter to be given.

[3] The next contention urged by appellant is that the Blacklisting Law denies to the railroad company the equal protection of the laws, in that the corporation, or receiver of the same, is required to do something which the individual employer is not required to do. In other words, employés of corporations, or receivers of corporations, are entitled to a

service letter, while employés of persons, partnerships, and joint-stock companies are not entitled to one. Attention is also called to the fact that competition may exist between corporations and others, and one would carry a burden from which the other is relieved.

The right to classify persons with respect to legislation is recognized by all courts, and it is agreed that the same shall not be arbitrarily done, but shall be based upon reason. However, in applying this rule much trouble has been experienced.

In the cases of Railway v. Grenig, 142 S. W. 135, and Railway v. Scott, 143 S. W. 710, in both of which writ of error was refused, the Act of the 31st Leg. (1st Called Session) p. 279, was held not obnoxious to this objection, although conferring upon employés engaged in the railroad business rights not given under our law to employés of persons engaged in other lines of business. In the case of Campbell v. Cook, 86 Tex. 630, 26 S. W. 486, 40 Am. St. Rep. 878, the Fellow-Servant Law, as it was first enacted, was held constitutional, although it applied only to railway corporations. In all of these cases the objection that the laws did not apply to other common carriers was held insufficient to constitute class legislation, and in the last-mentioned case the law only applied to corporations, although it has since been changed to include persons and receivers operating or controlling railroads. The objection, that the law did not include individuals, copartnerships, joint-stock companies, and receivers, was not specifically urged; the only objection being that it did not apply to other common carriers. However, as the court expressly held it did not apply to receivers and had the fact in mind that receivers were engaged in business as common carriers, we may assume that the court considered it immaterial that the law did not include receivers, and of course, if such fact was immaterial, then it would also be unnecessary that it should include individuals, copartnerships, and joint-stock companies. The court cited the case of Railway v. Mackey, 127 U. S. 209, 8 Sup. Ct. 1161, 32 L. Ed. 107, and other decisions by the Supreme Court of the United States. It does not appear from the above-discussed cases that the classification was required to be based upon the kind of business conducted because said laws did not apply to other common carriers than railroads, though such other carriers might come in competition with the railroads.

In the case of Beaumont Traction Co. v. State, 57 Tex. Civ. App. 605, 122 S. W. 615, an act making it unlawful for an electric railway corporation to operate its cars during certain months without screening the forward end for the protection of the motorman was held unconstitutional because applying only to corporations engaged in such business, while persons, copartnerships, and joint-stock companies could engage in the business without thus equipping the cars. No writ of error was applied for in said case. In the case of State v. T. & P. Ry. Co., 143 S. W. 223, the Eighth Court of Civil Appeals upheld the constitutionality of Acts of 31st. Legislature, c. 96, compelling railroad corporations to maintain water-closets at passenger stations; the court expressing the opinion that such holding was in accord with the opinions of our Supreme Court in the cases of Campbell v. Cook, supra, Insurance Co. v. Chowning, 86 Tex. 655, 26 S. W. 982, 24 L. R. A. 504, and Supreme Lodge v. Johnson, 98 Tex. 1, 81 S. W. 18. The court intimated that if it was an original proposition it would be inclined to hold that the classification made in the law was arbitrary in not including receivers, but laid no stress upon the failure to include individuals, copartnerships, associations, and trustees, since as a practical matter railroads are owned and operated by corporations or receivers, and the Legislature may deal with practical conditions.

In the case of Railway v. Mackey, 127 U. S. 205, 8 Sup. Ct. 1161, 32 L. Ed. 107, the court sustained the Fellow-Servant Law of Kansas, which applied to every railroad company organized or doing business in the state, and said in part: "And when legislation applies to particular bodies or associations, imposing upon them additional liabilities, it is not open to the objection that it denies to them the equal protection of the laws, if all persons brought under its influence are treated alike under the same conditions."

In the case of Railway v. Ellis, 165 U. S. 150, 17 Sup. Ct. 255, 41 L. Ed. 666, the Supreme Court of the United States held unconstitutional the Act of April 5, 1889 (Laws 1889, c. 107), passed by our Legislature, requiring railroad corporations to pay $10 attorney's fees on certain claims, upon the ground that the classification made was arbitrary. The court said, in part: "If it be said that this penalty is cast only upon corporations, that to them special privileges are granted, and therefore upon them special burdens may be imposed, it is a sufficient answer to say that the penalty is not imposed upon all corporations. The burden does not go with the privilege. Only railroads, of all corporations, are selected to bear this penalty. The rule of equality is ignored. It may be said that certain corporations are chartered for charitable, educational, or religious purposes, and abundant reason for not visiting them with a penalty for the nonpayment of debts is found in the fact that their chartered privileges are not given for pecuniary profit. But the penalty is not imposed upon all business corporations, all chartered for the purpose of private gain. The banking corporations, the manufacturing cor-

porations, and others like them, are exempt. Further, the penalty is imposed, not upon all corporations charged with the quasi public duty of transportation, but only upon those charged with a particular form of that duty. So the classification is not based on any idea of special privileges by way of incorporation, nor for special privileges given thereby for purposes of private gain, nor even of such privileges granted for the discharge of one general class of public duties."

In the case of Railway v. Paul, 173 U. S. 402, 19 Sup. Ct. 419, 43 L. Ed. 746, the court upheld an act by the Arkansas Legislature requiring railroad companies to pay their employés when discharged their unpaid wages, or the same should continue at the same rate, not exceeding 60 days, until payment was made. Considerable stress was laid upon the constitutional provision of said state providing that a charter of incorporation could be revoked whenever in the opinion of the Legislature such charter was injurious to the citizens of the state. It was held that this reservation of right to revoke authorized an amendment; the court saying: "This act was purely prospective in its operation. It did not interfere with vested rights, or existing contracts, or destroy, or sensibly encroach upon, the right to contract, although it did impose a duty in reference to the payment of wages actually earned, which restricted future contracts in the particular named."

In the case of State v. Missouri Pac. R. R. Co., supra, the Supreme Court of Missouri held a law constitutional which required the semimonthly payment of wages by all corporations doing business in the state, such law being held a valid exercise of the police power, and as not an arbitrary classification because there is a difference between corporate employers and individual employers in the extent of liability of those engaging in the business, and the laborer has better facilities for knowing the financial status of the individual employer, and the latter in general ceases an unprofitable business more readily than a corporation conducted by agents.

From the two Texas cases first discussed, it is seen that the mere fact that employés of corporations are given benefits not given to other employés is insufficient to constitute arbitrary classification, and from the other Texas cases it is seen that, if this law mentioned only railroad corporations and receivers thereof, such classification would be upheld. Appellant cannot contend that any of its competitors would be exempted from the burden to which it is subjected under this law, because as a practical matter the business of railroads in Texas is conducted by corporations and receivers. However, appellant seeks to avail itself of the inequality that other corporations may be subjected to under this act, which in fact do compete with individuals and copartnerships. While it appears reasonable and right that no discrimination should be made by the Legislature between a business conducted by an individual and identically the same business conducted by a corporation, unless the discrimination be in respect to a matter in which the fact of incorporation solely makes the difference, yet there is at least a strong inference to be indulged that our Supreme Court, in the case of Campbell v. Cook, supra, considered it unnecessary that a classification include the receiver conducting a railroad business as well as a corporation engaged in such business. In the case of Nash Hardware Co. v. Morris, 146 S. W. 876, our Supreme Court, in speaking of classification, said: "If it applies alike to all of the same kinds of business, and to all of the same classes of persons, the law is not in violation of the state or federal Constitution." Conceding that this is the general rule, we cannot reconcile such rule with the cases of Campbell v. Cook, and State v. T. P. Ry. Co., 143 S. W. 223, unless a distinction be made on the ground that corporations engaged in a certain business can be classified to themselves because mere creatures of the state and subject to regulative measures. It further appears from the excerpt copied herein from the opinion in the case of Railway v. Ellis, 165 U. S. 150, 17 Sup. Ct. 255, 41 L. Ed. 666, that all corporations might themselves constitute a class, and said case was probably considered by the author of the law now being discussed as authority for including all corporations in order to make a legal classification. However, there is also authority to the effect that, when all corporations are made a class, it should be for some reason applying to all. Corporations are granted certain privileges which are considered valuable, and regulations can be made in the nature of limitations under which they must conduct business, and even after the charter is issued they have no vested right in the laws remaining the same with respect to the conduct of their affairs. It therefore appears reasonable that for purposes of legislation they may be dealt with as a class to themselves, and be restricted to exact only an equality of legislation as between themselves. This doctrine appears to have been approved in the case of Arkansas Stave Co. v. State (Ark.) 125 S. W. 1005, 27 L. R. A. (N. S.) 255.

[4] It is also contended that the Blacklisting Law is in violation of the state and federal Constitutions in regard to unreasonable searches and seizures. We consider it obvious that the said constitutional provisions are not violated by this law. Reports and statements are frequently exacted by law, upon which liability may arise if false, so in this case, unless a true statement is made, the corporation is liable to fine and to the payment of damages.

We have carefully considered the ques-

tions relating to constitutionality of the Blacklisting Law, and have made such discussion of same as we deemed the questions entitled to receive, and bearing in mind the rules for construing laws attacked upon the grounds of unconstitutionality, as clearly and ably enunciated in the case of Brown v. City of Galveston, 97 Tex. 9, 75 S. W. 488, we conclude, as did the Fifth Court of Civil Appeals, that it is our duty to uphold the statute, although feeling that some of the questions are so close that judges may well differ in regard to the same.

[5] The second error presented includes the thirty-seventh, thirty-eighth, and thirty-ninth assignments, which present the contention that a statement made under the Blacklisting Law is privileged. The reasons urged would be very strong if the liability asserted was claimed under the common law; but, when the Legislature has enacted a law, we do not feel authorized to read into it a limitation precluding recovery unless actual malice be shown. The Legislature in enacting the Libel Law saw fit to define the privileged matter, and certainly, had it intended that the statement required under this law should be privileged, it would have said so. The assignments are overruled.

The third error presented is based upon assignments 25, 30, 33, and 34, all of which complain of the refusal to give special charges variously presenting the issue of the truth or falsity of the statement furnished appellee.

[6] The court submitted the issue to the jury to find whether the statement was true or false, and also gave the jury the following definition: "By the term 'true statement,' as above used, is meant that the employer should give fairly, honestly, and in good faith the grounds or cause of discharge." The charge as given was complete and fair, and it was unnecessary to give the special charges. The assignments are overruled.

[7] The fourth error presented is based upon assignments 24 and 28, both of which complain of the refusal of peremptory charges to find for appellant.

Appellee testified that at the time he was discharged by appellant he had had about 10 years' experience in railroad work, about 5 years as a section hand and about 5 years as foreman. He introduced a service letter from the Frisco road showing his services as section foreman from August 22, 1907, to December 31, 1908, had been satisfactory, and that he resigned; another service letter from the Frisco showing that he was employed as section laborer from March 1, 1906, to June 15, 1906, and as foreman from June 15, 1906, to August 31, 1906, and resigned; also, one from appellant stating that he served satisfactorily as assistant extra gang foreman from March 25, 1910, to April 1, 1910, and resigned. He also introduced a service letter from the Ft. Worth & Denver City Railway Company showing he served as section foreman from September 18, 1906, to May 13, 1907, and resigned; also, the service letter upon which this case is based. He testified that he was discharged from the Frisco for his failure to dress track properly. The testimony was conflicting in regard to whether or not appellee could surface and line track and distribute his work properly, with appellant having rather the best of it in regard to the number of witnesses.

Appellee testified: That about July 10th he received permission to go to Plano, about three-fourths of a mile or a mile off from his section, to get groceries, and there met J. J. Hughes, appellant's roadmaster, who accosted him in a rough and abusive manner, and ordered him to get "back on the job." That he (appellee) took the car off and went up to purchase his groceries, and when he returned Hughes was at his car. That Hughes had followed him up. That he did not know it was Hughes, but thought perhaps it was. And that he said to Hughes, "Who are you, anyway, around trying to raise such a racket with me?" and Hughes said he was the general roadmaster, J. J. Hughes, whereupon appellee said: "I ain't no nigger, Mr. Hughes. I don't like to take such rough talk off of you. I have permission to come up here from my assistant roadmaster to get these groceries." That Hughes said he did not know what permission appellee had, and walked off. Appellee testified further that he was discharged in about 10 days after this occurrence, and that the assistant roadmaster, Green, during the time of his employment never made any objection to his work nor complained of his services with reference to lining track or distributing work. He further testified that Green told him his services were satisfactory, after he had been there two or three weeks, and also said that appellee had made a big improvement; further, that, when sent over on another section by Green, the latter came over there and told him he had done well and to go back the next day and put in another day's work there. Green's testimony, in part, was as follows: "From the time Mr. Griffin worked, from May 9th to July 18th, I never made any complaints to him personally about his surfacing and lining track. I gave him notice where to work. As stated before, he was very energetic, and, where a man is energetic and shows his willingness to do the work, there is no use to go and say anything to him when he is doing his best. It is up to you to get rid of him. I am not sure whether I ever said anything to him; I wouldn't say. His energy and his willingness prevented me from chastising him in any way. I wouldn't say whether I told him anything about his lining and surfacing not being satisfactory or not." He also testified he did not remember the conversations testified to by appellee. He said positively that he knew nothing of the trou-

ble between appellee and Hughes at the time he discharged appellee; that he did so because appellee, though very energetic, simply was not able to distribute his work properly and to line and surface track; that he kept appellee as long as he did because he hoped for improvement. It was Green's custom to throw notices from the end of the train called "butterflies," by which he called the attention of the section foremen to matters in their line of duty. Plaintiff introduced three of these notices, one calling attention to Johnson grass on right of way, and danger of grain catching fire in a field; another, dated three days after his employment, informing him that he was placed permanently on the section where he was then working; and, the third, instructing him to take his gang over on another section and work there.

Appellee applied to a roadmaster for the Santa Fé for work, and was required to show his service letter issued by appellant, whereupon he was refused employment. It appears from the testimony of the witness P. L. Wing, who was chief clerk for the first vice president and general superintendent of appellant road, that a system existed by which the railroad officials could in their office investigate an employé's previous record with other railroads. He testified he signed the superintendent's name to the service letter; that the information they received came through the roadmaster's office, which was according to custom.

If the testimony of Green was taken as absolutely true, appellee, of course, would have no case, and appellant claims the same is uncontradicted to the extent at least that from his standpoint the reasons for appellee's discharge are true. There could, of course, be no direct contradiction of such evidence; but when the evidence indicates that during all the time appellee was employed there Green never once called his attention to his supposed deficiencies, and Green will not deny the conversations appellee testifies to, the jury has a right to doubt whether he really discharged appellee for the reasons given by him. Green's memory was very good except on the question whether he ever told appellee anything about not doing his work right, and on the question whether he told appellee his work was satisfactory. The jury had the witness before them, and where there were circumstances inconsistent with his testimony, he being an interested party, they could disregard the same.

. Counsel for appellee state in their brief that the testimony of appellee shows that Hughes, the roadmaster, was present at the trial of this case, but failed to testify. No reference is made to the page of the record where this testimony is to be found, nor have we noticed same in reading the record. However, we think his failure to testify

would be a circumstance entitled to little weight.

We find that there was evidence from which the jury could find that the statement given appellee was untrue, and that same was not made fairly, honestly, and in good faith.

Judgment affirmed.