## PRUDENTIAL INSURANCE COMPANY OF AMERICA v. CHEEK.

### ERROR TO THE ST. LOUIS COURT OF APPEALS, STATE OF MISSOURI.

No. 149. Argued March 6, 1922.—Decided June 5, 1922.

1. The Service Letter Law of Missouri, requiring every corporation doing business in the State to furnish, upon request, to any employee, when discharged or leaving its service, a letter, signed by the superintendent or manager, setting forth the nature and duration of his service to the corporation and stating truly the cause of his leaving, is not an arbitrary interference with freedom of contract amounting to a deprivation of liberty or property without due process of law. P. 534.

2. This requirement is within the regulatory power of the State over foreign and domestic corporations. Pp. 536, 544.

3. The requirement does not deny the equal protection of the laws in being made of corporations and not of individuals. P. 546.

4. The Federal Constitution imposes no restriction on the States protective of freedom of speech, or liberty of silence, or the privacy of individuals or corporations. P. 543.

5. A decision of a state court holding that an agreement of several insurance companies having a monopoly of a line of insurance business in a city, that neither would employ within two years any man who had been discharged from or left the service of either of the others, was unlawful, and sustaining an action against one of the companies by its former employee for damages resulting from the agreement, does not deprive the defendant of property without due process of law in violation of the Fourteenth Amendment. P. 547.

6. Under Jud. Code § 237, as amended 1916, when a case is properly here on writ of error because involving the constitutionality of a statute, other federal questions which in themselves warrant review only by certiorari, will be determined also. P. 547.

223 S. W. 754, affirmed.

ERROR to a judgment affirming a judgment on verdict for the plaintiff, Cheek, in his action for damages against the Insurance Company.

*Mr. John H. Holliday*, with whom *Mr. S. W. Fordyce, Mr. T. W. White, Mr. W. H. Woodward, Mr. W. R. Mayne, Mr. Alfred Hurrell* and *Mr. James Guest* were on the briefs, for plaintiff in error.

*Mr. Frederick H. Bacon*, for defendant in error, submitted.

MR. JUSTICE PITNEY delivered the opinion of the court.

Robert T. Cheek sued the Prudential Insurance Company of America in the Circuit Court of St. Louis to recover damages upon a cause of action set forth in two counts: First, that the company being a New Jersey corporation conducting a life insurance business in Missouri under license of the insurance department of that State, and plaintiff having been for more than ten years continuously employed in its service, and having resigned said employment and left the company's service, plaintiff demanded of defendant's superintendent a letter setting forth the nature and character of the services rendered by him to said corporation and the duration thereof, and truly stating for what cause plaintiff had quit said service; that defendant, acting through its superintendent, without just cause refused to give to plaintiff such a letter, as provided by statute, and because of this plaintiff had been unable to secure employment and had suffered substantial damages. The second count was based upon an alleged unlawful agreement between defendant and two other companies, the Metropolitan Life Insurance Company and the John Hancock Mutual Life Insurance Company, said companies having a monopoly of the industrial life insurance business in St. Louis, to the effect that

neither would for a period of two years after his leaving the employ of either company employ any man who for any reason had left the service of or had been discharged by either of the other companies, by which means plaintiff had been rendered unable to secure employment and had sustained substantial damages.

The first count was based upon § 3020, Missouri Revised Statutes, 1909, which reads as follows: " Whenever any employe of any corporation doing business in this State shall be discharged or voluntarily quit the service of such corporation, it shall be the duty of the superintendent or manager of said corporation, upon the request of such employe (if such employe shall have been in the service of said corporation for a period of at least ninety days), to issue to such employe a letter, duly signed by such superintendent or manager, setting forth the nature and character of service rendered by such employe to such corporation and the duration thereof, and truly stating for what cause, if any, such employe has quit such service; and if any such superintendent or manager shall fail or refuse to issue such letter to such employe when so requested by such employe, such superintendent or manager shall be deemed guilty of a misdemeanor, and shall be punished by a fine in any sum not exceeding five hundred dollars, or by imprisonment in the county jail for a period not exceeding one year, or by both such fine and imprisonment."

A general demurrer interposed to each count was sustained by the trial court, and, plaintiff declining to plead further, judgment was rendered for defendant, from which plaintiff appealed to the Supreme Court of the State. That court, construing § 3020, held that it imposed a duty not upon the superintendent or manager personally but upon the corporation acting through its superintendent or other proper officer, to issue the letter; that the statute having imposed this duty for the public benefit

and also for the benefit of the employees of corporations; the public remedy by fine or other penalty was not exclusive and the plaintiff as a party injured was entitled to recover his damages; overruled various constitutional objections raised by defendant to the validity of § 3020, among others that it deprived the corporation of liberty of contract without due process of law and denied it the equal protection of the laws, in violation of the Fourteenth Amendment; held that the agreement or combination alleged in the second count gave the corporations a monopoly in their business, contrary to the law and public policy of the State, and if it prevented plaintiff from obtaining employment entitled him to recover his damages caused thereby; sustained both counts on all points, reversed the judgment, and remanded the cause for trial. 192 S. W. 387.

Defendant thereupon answered the petition, reiterating in its plea to the first count the constitutional objections to § 3020, and in its plea to the second count averring that to permit a recovery against it by reason of the alleged agreement between the companies would deprive defendant of its property and its right to contract without due process of law in violation of the Fourteenth Amendment.

On the issues so made up, the case went to trial and resulted in a verdict in favor of plaintiff upon both counts. Defendant having reserved its constitutional points, appealed from the resulting judgment to the Supreme Court, which, however, refused to take jurisdiction on the ground that all constitutional questions had been decided on the former appeal and that the verdict, being for only $1500, was less than the jurisdictional amount required by statute; and hence transferred the cause to the St. Louis Court of Appeals for final disposition. 209 S. W. 928. Defendant, treating this decision of the Supreme Court as a final judgment reviewable by writ of error from this court, sued out such a writ, and upon the ground that the judgment

was not final under the state law the cause was dismissed March 8, 1920. 252 U. S. 567. Thereafter it was submitted to the St. Louis Court of Appeals, which in conformity to the former opinion of the Supreme Court affirmed the judgment (223 S. W. 754), overruled a motion for rehearing and refused an application for certification of the case to the Supreme Court. A writ of error from this court to the St. Louis Court of Appeals followed, under § 237, Judicial Code, as amended by Act of September 6, 1916, c. 448, 39 Stat. 726.

A motion to dismiss the latter writ, based upon the ground that the judgment of the Court of Appeals is not that of the highest court of the State in which a decision in the suit could be had, because the first decision of the Supreme Court rendered the constitutional questions *res judicata,* and that under the state constitution the Court of Appeals has no jurisdiction to pass upon questions of that character, manifestly must be denied, and the case considered on its merits.

The argument in support of the contention that the Service Letter Act is repugnant to the due process of law clause of the Fourteenth Amendment in brief is that at common law an employer is under no obligation to give a testimonial of character or clearance card to his employee; that no man is compelled to enter into business relations with another unless he desires to do so, and upon the dissolution of such relations no man can be compelled to divulge to the public his reasons for such dissolution; that it is a part of every man's civil rights that he be at liberty to refuse business relations with any other person, whether the refusal rests upon reason or is the result of whim, caprice or malice, and with his reasons neither the public nor third persons have any legal concern; and that in the absence of a contract either employer or employee may sever the relation existing between them for any reason or without reason and may not be compelled to divulge

the reason without material interference with his fundamental rights. Assuming the rules of the common law to be as stated, it is obvious that to say they have an unqualified and universal application unalterable by statute, begs the question at the outset.

Section 3020 of the Revised Statutes of Missouri, now a part of the general corporation laws of the State, was derived from an Act of April 14, 1905 (Mo. Laws 1905, p. 178), entitled "An Act for the protection of laboring men by requiring employing corporations to give letter showing service of employe quitting service of such corporation, and providing penalty for violation of this act." In giving its genesis the Supreme Court declared (192 S. W. 389): " Prior to the enactment of this statute a custom had grown up in this state, among railroad and other corporations, not to employ any applicant for a position until he gave the name of his last employer, and upon receiving the name, it would write to said former employer, making inquiry as to the cause of the applicant's discharge, if discharged, or his cause for leaving the service of such former company. If the information furnished was not satisfactory, the applicant was refused employment. This custom became so widespread and affected such vast numbers of laboring people it became a public evil, and worked great injustice and oppression upon large numbers of persons who earned their bread by the sweat of their faces. The statute quoted was enacted for the purpose of regulating that custom, not to destroy it (for it contained some good and useful elements, enabling the corporations of the state to ascertain the degree of the intelligence as well as the honesty, capacity, and efficiency of those whom they wished to employ, for whose conduct they are responsible to the public and their fellow employees), and thereby remedy the evil which flowed therefrom." And again, (p. 392): " The statute under consideration imposes no unjust burden or expense upon the respondent or other

corporations doing business in this state. It was designed to protect the public interests as well as the wage-earner, against an injurious custom given birth to and fostered by said corporations. That a foreign corporation has no inherent right to exist or to do business in this state is no longer an open question. It derives those rights from the state, impressed with such conditions and burdens as the state may deem proper to impose, and when such a corporation comes into this state to do business, it must conform to the laws of this state, and will not be heard to complain of the unconstitutionality of our police regulations."

That freedom in the making of contracts of personal employment, by which labor and other services are exchanged for money or other forms of property, is an elementary part of the rights of personal liberty and private property, not to be struck down directly or arbitrarily interfered with, consistently with the due process of law guaranteed by the Fourteenth Amendment, we are not disposed to question. This court has affirmed the principle in recent cases. *Adair* v. *United States*, 208 U. S. 161, 174; *Coppage* v. *Kansas*, 236 U. S. 1, 14.

But the right to conduct business in the form of a corporation, and as such to enter into relations of employment with individuals, is not a natural or fundamental right. It is a creature of the law; and a State in authorizing its own corporations or those of other States to carry on business and employ men within its borders may qualify the privilege by imposing such conditions and duties as reasonably may be deemed expedient in order that the corporation's activities may not operate to the detriment of the rights of others with whom it may come in contact.

The statute in question is of this character; in it the legislature has recognized that, by reason of the systematic methods of engaging and dismissing employees that

employing corporations themselves established, " letters
of dismissal," or something of the kind, are not only cus-
tomary but a matter of necessity to those seeking em-
ployment, as well as to the corporations themselves, per-
haps more necessary to those seeking employment, be-
cause of their want of organization, than to the corpor-
ations.

Can it be called an unreasonable or arbitrary regulation
that requires an employing corporation to furnish to an
employee, who after having served it for a time is dis-
charged or voluntarily quits the service, a letter signed
by the superintendent or manager setting forth the na-
ture, character and duration of the service rendered and
for what cause, if any, he left the service? It does not
prevent the corporation from employing whom it pleases
on any terms that may be agreed upon. So far as con-
strued and applied in this case it does not debar a cor-
poration from dismissing an employee without cause, if
such would be its right otherwise, nor from stating that
he is dismissed without cause if such be the fact. It does
not require that it give a commendatory letter. There is
nothing to interfere, even indirectly, with the liberty of
the corporation in dealing with its employee, beyond
giving him, instead of what formerly was called a " refer-
ence " or " character," a brief statement of his service
with the company according to the truth, a word of intro-
duction to be his credentials where otherwise the oppor-
tunity of future employment easily might be barred or
impeded.

That statutes having the same general purpose, though
sometimes less moderate provisions, have been adopted
in other States attests a widespread belief in the necessity
for such legislation. Indiana Rev. Stat. 1901 (Horner),
§ 5206r; Acts 1911, c. 178; Acts 1915, c. 51; Montana
Rev. Codes 1907, §§ 1755–1757; Nebraska Rev. Stat. 1913,
§§ 3572–3574; Oklahoma Rev. Laws 1910, § 3769; Texas

Rev. Civil Stat. 1911, Art. 594. Fifty years ago, in an act for the protection of seamen, Congress established and still maintains a provision that upon the discharge of any seaman, or upon payment of his wages, the master shall sign and give him a certificate of discharge, specifying the period of his service and the time and place of discharge, in a prescribed form which calls for numerous identifying particulars and permits a statement of the seaman's character and capacity. Act June 7, 1872 c. 322, § 24, 17 Stat. 262, 267, 280; Rev. Stats. § 4551; Table B, p. 896.

Plaintiff in error places much reliance upon expressions of opinion contained in a number of cases in the state courts, chiefly the following:

*Wallace* v. *Georgia, C. & N. Ry. Co.*, 94 Ga. 732. Here the Supreme Court of Georgia held that " An Act to require certain corporations to give to their discharged employees or agents the causes of their removal or discharge, when discharged or removed," was contrary to the fundamental law of the State, on the ground that the public, whether as a multitude or a sovereignty, had no interest to be protected or promoted by a correspondence between discharged agents or employees and their late employers, designed, not for public, but for private information as to the reasons for discharges; and that the statute was violative of the general private right of silence enjoyed in that State by all persons, natural or artificial, from time immemorial; liberty of speech and of writing being secured by the state constitution, " and incident thereto is the correlative liberty of silence, not less important." The case obviously is not in point, since the Constitution of the United States imposes upon the States no obligation to confer upon those within their jurisdiction either the right of free speech or the right of silence.

*Atchison, Topeka & Santa Fe Ry. Co.* v. *Brown*, 80 Kans. 312, held that a service letter statute of that State (Laws 1897, c. 144; Gen. Stat. 1901, § 2422) was repug-

nant to § 11 of the bill of rights of the State and " an interference with the personal liberty guaranteed to every citizen by the state and federal constitutions.". The section of the bill of rights relied on was " All persons may freely speak, write or publish their sentiments on all subjects, being responsible for the abuse of such right." This of course has no present significance.   The reference to the Federal Constitution was to § 1 of the Fourteenth Amendment, but the opinion does not indicate what bearing, if any, the due process of law clause was deemed to have.   It appears rather that the right to discharge a servant for any reason or for no reason was thought to be one of the " privileges or immunities of citizens of the United States."   But, as this court more than once has pointed out, the privileges or immunities of citizens protected by the Fourteenth Amendment against abridgment by state laws are not those fundamental privileges and immunities inherent in *state* citizenship, but only those which owe their existence to the Federal Government, its national character, its constitution, or its laws.  *Slaughter-House Cases*, 16 Wall. 36, 72–74; 77–80; *Duncan* v. *Missouri*, 152 U. S. 377, 382; *Maxwell* v. *Bugbee*, 250 U. S. 525, 538.   The reasoning of the Supreme Court of Kansas in this case is not convincing.   The case was cited in *Coppage* v. *Kansas*, 236 U. S. 1, 24; not however in approval of its views upon the question now presented, but in order to show that the court had recognized that under the law of the State an employer might discharge his employee for any reason or without reason, and could not be compelled to give a reason where one did not exist; a view inconsistent as we thought with the same court's decision in the *Coppage Case*, then under review.

The legislature of Texas placed upon the statute book an act aimed at " Blacklisting " (Rev. Civil Stat. 1911, Art. 594), which required that any corporation or receiver of the same, doing business in the State, having discharged

an employee should furnish him with a true statement of the cause of discharge, or a statement in writing that he had left the service voluntarily; besides other provisions much more onerous and which were especially criticised by the Supreme Court of the State when it came to pass upon the constitutionality of the act.

This statute, having twice been sustained as constitutional by the Court of Civil Appeals (*St. Louis Southwestern Ry. Co. of Texas* v. *Hixon* [1910], 126 S. W. 338; reversed by the Supreme Court, without passing upon the constitutional question, 104 Tex. 267, 270; *St. Louis Southwestern Ry. Co. of Texas* v. *Griffin* [1913], 154 S. W. 583), was passed upon by the Supreme Court in the latter case, and the act declared invalid, 106 Tex. 477 (1914). That court declared that the liberty of contract was a natural right of the citizen beyond the power of the Government to take from him; in effect that the same liberty pertained to a corporation employer as to an individual employee; by implication that the statutory provision requiring such an employer to furnish its discharged employee with a statement of the cause of his discharge amounted to a destruction of the corporation's right to discharge the employee without cause and " a violation of the constitutional right of equal protection of the law as secured by the Fourteenth Amendment "; that to confer upon an employee the right to recover damages if the corporation upon his dismissal should fail to give him a statement of the true cause of his discharge was " a violation of the natural right to speak or be silent, or the liberty of contract secured by the constitution of this State and of the United States "; besides much in criticism of certain so-called inquisitorial provisions not found or paralleled in the Missouri statute that we are considering.

*Opinion of the Justices*, 220 Mass. 627, is an advisory opinion to the senate of the Commonwealth upon a pro-

posed measure of legislation, to the effect, " that no employee of a railroad corporation shall be disciplined or discharged in consequence of information affecting the employee's conduct until such employee shall have been given an opportunity to make a statement in the presence of the person or persons furnishing the information "; and that the corporation be prohibited from discharging an employee without compliance with the proposed provisions. under a heavy penalty. The opinion appears to have been based upon the ground, among others, that the proposed bill would require the corporation to produce at a hearing the person from whom it had derived its information even though such person might be a stranger to the railroad and declined for any reason or was unable to confront the employee. After quoting views expressed by this court in *Allgeyer* v. *Louisiana,* 165 U. S. 578; *Lochner* v. *New York,* 198 U. S. 45, 53; *Adair* v. *United States,* 208 U. S. 161, 174–175; *Coppage* v. *Kansas,* 236 U. S. 1, 14, the opinion proceeded: " It seems to us impossible to say that the right of an employer to discharge an employee because of information affecting his conduct in respect of efficiency, honesty, capacity, or in any other particular touching his general usefulness, without first providing a hearing, stands on a different footing or is less under the shield of the constitution than the right held to be secured in the *Adair* and *Coppage Cases.* . . . In the absence of a contract, conspiracy or other unlawful act, the right of the individual employee to leave the service of a railroad without cause, or for any cause, is absolute. The railroad has the correlative right under like circumstances to discharge an employee for any cause or without cause. It is an unreasonable interference with this liberty of contract to require a statement by the employer of the motive for his action in desiring to discharge an employee, as this statute in substance does, and to require him also as a prerequisite to the exercise of his right, to enable the employee to make

a statement in the presence of some one else,—a thing
which may be beyond the power of the employer. His
freedom of contract would be impaired to an unwar-
rantable degree by the enactment of the proposed stat-
ute.   .  .  ."

For reasons thus outlined five of the seven justices ex-
pressed the view that the proposed bill would be invalid as
an unreasonable interference with the liberty of contract;
and for other reasons not necessary to be mentioned. It
will be noted that the proposed bill had a direct effect
upon the relations between employer and employee, pend-
ing the employment, which the Missouri statute has not.

We have examined the opinions referred to with the care
called for by the importance of the case before us; and are
bound to say that, beyond occasional manifestations of a
disinclination to concede validity to acts of legislation hav-
ing the general character of Service Letter Laws, we have
found nothing of material weight; no well-considered
judgment, much less a formidable body of opinion, worthy
to be regarded as supporting the view that a statute which.
like the Missouri statute, merely requires employing cor-
porations to furnish a dismissed employee with a certifi-
cate setting forth the nature and character of the service
rendered, its duration, and for what cause, if any, the em-
ployee has left such service, amounts to an interference
with freedom of contract so serious and arbitrary as prop-
erly to be regarded a deprivation of liberty or property
without due process of law, within the meaning of the
Fourteenth Amendment.

The cases cited from Georgia, from Kansas, and from
Texas place material dependence upon provisions of the
several state constitutions guaranteeing freedom of speech,
from which is deduced as by contrast a right of privacy
called the " liberty of silence "; and it seems to be thought
that the relations between a corporation and its employees
and former employees are a matter of wholly private con-

cern. But, as we have stated, neither the Fourteenth Amendment nor any other provision of the Constitution of the United States imposes upon the States any restrictions about "freedom of speech" or the "liberty of silence"; nor, we may add, does it confer any right of privacy upon either persons or corporations.

Previous decisions of this court are far from furnishing support for the contentions of plaintiff in error. *Allgeyer* v. *Louisiana,* 165 U. S. 578, related to legislation of a wholly different character and contains nothing that bears upon this. *Lochner* v. *New York,* 198 U. S. 45, dealt with a statute concededly valid if enacted in the interest of the public health, and held it void on the ground that in truth it was not, within the fair meaning of the term, a health law but was an illegal interference with the right of individuals to make contracts upon such terms as they might deem best. *Adair* v. *United States,* 208 U. S. 161, 174–175; *Coppage* v. *Kansas,* 236 U. S. 1, 17, dealt with statutes—the former with an act of Congress making it criminal for a common carrier in interstate commerce to discharge an employee because of his membership in a labor organization; the latter with a state law making it criminal to prescribe as a condition upon which one might secure or retain employment that the employee should agree not to become or remain a member of any labor organization while so employed; and this in the absence of contract between the parties, coercion on the part of the employer, or incapacity or disability on the part of the employee. In accord with an almost unbroken current of authority in the state courts holding statutes of that character to be invalid, this court came to a like conclusion. In the latter case there was a direct interference with freedom in the making of contracts of employment not asserted to have relation to the public health, safety, morals or general welfare beyond a purpose to favor the employee at the expense of the employer, and

to build up the labor organizations, which we held was not properly an exercise of the police power. This statute, in making it criminal, as it did upon the construction adopted and applied, for an employer to prescribe as a condition of employing or retaining a man competent and willing to assent to the condition, that he should agree not to become or remain a member of a labor organization while so employed, the employee being subject to no incapacity or disability, but on the contrary free to exercise a voluntary choice, in effect made it a compulsory and unwelcome term of the employment that the employee *must* be left free to join a labor union; membership in which reasonably might be expected to interfere materially with the member's fidelity to his employer.

As has been shown, the Missouri statute interposes no obstacle or interference as to either the making or the termination of contracts of employment, and prescribes neither terms nor conditions. The Supreme Court of the State, having ample knowledge of the conditions which gave rise to the particular legislation, declares with an authority not to be denied that it was required in order to protect the laboring man from conditions that had arisen out of customs respecting employment and discharge of employees introduced by the corporations themselves. It sustains the act as an exercise of the police power, but in truth it requires no extraordinary aid, being but a regulation of corporations calling for an application of the familiar precept, *sic utere tuo,* etc., in a matter of general public concern. Except by consent of the State the corporation, foreign or domestic, would have no right to employ laborers within its borders. A foreign corporation does not, as intimated by the court below, waive any constitutional objection by coming in (see *Terral* v. *Burke Construction Co.,* 257 U. S. 529). But it has no valid objection to such reasonable regulations as may be prescribed for domestic corporations similarly

circumstanced. The State with good reason might regulate the terms and conditions of employment, including the methods of accepting and dismissing employees, so as to prevent the corporations from producing undue detriment to the individuals concerned, either while employed or when afterwards they are called upon to seek other employment. In our opinion, no danger of " blacklisting " is necessary to justify legislation requiring that corporations dismissing employees furnish them with a certificate stating the period of the service, its nature and character, and the cause, if any, that led to its termination. It might be recognized that in the highly organized conditions of industry now prevailing—largely developed by the corporations themselves and to which their success is greatly due—it is not to be expected that unemployed men can obtain responsible employment without some credentials proceeding from a former employer. The legislature might believe it to be well understood that a period of employment by a corporation—notably so in the case of insurance companies—is a test of capacity, fidelity and the other qualities that go to make efficiency; that such a corporation may operate as a training school fitting employees not only for its own but for other lines of employment. Such a training may almost inevitably produce effects upon the individuals in forming both character and reputation—effects that cannot be brought to an end at the will of the employee or of the corporation or both of them combined, although the employment may be terminated at the will of either; but may continue while the employee lives; his employment with the corporation remains a part of what is called his " record," by which he must be judged whenever afterwards he may be in search of employment. The reputation of the dismissed employee is an essential part of his personal rights—of his right of personal security (1 Black. Com. 129; 3 *id.* 119). Even the common law regarded

9545°—23——35

a man's public repute as a fact having a bearing upon his ability to earn a livelihood; looked upon a good reputation in a particular trade or calling as having special pecuniary value; regarded a prospective employer as privileged to make inquiries about what his would-be employee had done in a former place of employment; conferred upon the former employer a privilege to communicate the truth in reply. What more reasonable than for the legislature of Missouri to deem that the public interest required it to treat corporations as having, in a peculiar degree, the reputation and well-being of their former employees in their keeping, and to convert what otherwise might be but a legal privilege, or under prevailing customs a "moral duty", into a legal duty, by requiring, as this statute does, that when an employee has been discharged or has voluntarily left the service it shall give him, on his request, a letter setting forth the nature and character of his service and its duration, and truly stating what cause, if any, led him to quit such service.

It is not for us to point out the grounds upon which the state legislature acted, or to indicate all the grounds that occur to us as being those upon which they may have acted. We have not attempted to do this; but merely to indicate sufficient grounds upon which they reasonably might have acted and possibly did act to show that it is not demonstrated that they acted arbitrarily, and hence that there is no sufficient reason for holding that the statute deprives the corporation of its liberty or property without due process of law.

The argument under the "equal protection" clause is unsubstantial. As we are assured by the opinion of the Supreme Court, the mischiefs to which the statute is directed are peculiarly an outgrowth of existing practices of corporations and are susceptible of a corrective in their case not so readily applied in the case of individual employers, presumably less systematic in their methods of

employment and dismissal. There is no difficulty, therefore, in sustaining the legislature in placing corporations in one class and individuals in another. See *Mallinckrodt Chemical Works* v. *St. Louis*, 238 U. S. 41, 55–56. And the act applies to all corporations doing business in the State, whether incorporated under its laws or not.

It is assigned for error, aside from the statute, that the decision of the Missouri court sustaining the cause of action under the second count amounts to depriving plaintiff in error of property without due process of law. This point was set up properly in the state courts as a special claim of immunity under the Fourteenth Amendment; and although under § 237, Judicial Code, as amended by the Act of September 6, 1916, c. 448, 39 Stat, 726, it could not have been made the basis of a writ of error from this court, but only a writ of certiorari, we think that, by the fair intendment of the act, since the record has been brought here properly under a writ of error because involving the constitutionality of a statute, plaintiff in error is at liberty to assign any other ground of error therein, based upon an adverse decision by the state court of last resort upon any right, title, privilege or immunity especially set up or claimed under the Constitution or laws of the United States.

The pith of the objection to the second count is that to permit a recovery against plaintiff in error on account of the agreement said to have been made between it and two other companies having a monopoly of the industrial life insurance business in the City of St. Louis, to the effect that neither of the three would within two years employ any man who had left the service of or been discharged by either of the others, was equivalent to depriving it of property without " due process of law." The Supreme Court held (192 S. W. 393), that the corporations had no lawful right to enter into a combination or

agreement the effect of which was to take from them the right to employ whomsoever they deemed proper, and at the same time deprive former employees of their constitutional right to seek employment. It seems to us clear that the State might, without conflict with the Fourteenth Amendment, enact through its legislative department a statute precisely to the same effect as the rule of law and public policy declared by its court of last resort. And for the purposes of our jurisdiction it makes no difference, under that Amendment, through what department the State has acted. The decision is as valid as a statute would be. No question of "equal protection" is raised here.

The judgment under review must be and is

*Affirmed.*

The Chief Justice, Mr. Justice Van Devanter and Mr. Justice McReynolds dissent.