# CIRCUIT COURT OF BALTIMORE CITY.

Filed April 4, 1928.

ALEXANDER E. DUNCAN

VS.

R. WALTER GRAHAM, ET AL., TRUSTEES "EMPLOYEES' RETIREMENT SYSTEM OF BALTIMORE CITY," AND R. WALTER GRAHAM, COMPTROLLER, ETC.

*Charles C. Wallace* and *Roger B. Williams* solicitors for complainant.

*A. Walter Kraus*, City Solicitor, and *Simon E. Sobeloff*, Deputy City Solicitor, solicitors for defendants.

*Charles Morris Harrison* solicitor for Edith Mae Bell, widow of J. Archer Bell.

O'DUNNE, J.—

This is a bill filed by complainant as a taxpayer to restrain the Board of Trustees of said retirement system and the defendant as comptroller from making payment as pension to the widow of the deceased, J. Archer Bell, City Register, killed June 27, 1927, at the corner of Lexington and St. Paul streets, a little after 9 A. M. It is alleged in the bill that the complainant would be injured as a taxpayer by the unlawful diversion in the payment of pensions under the ordinance, and particularly Section 9 thereof, the validity of which is attacked in these proceedings, and it is stated that something over thirty million dollars is involved in the present controversy because under the terms of the ordinance the system provided for covers a period of thirty years in the creation of the fund and in the working out of the system of retirement provided for in said ordinance, and that the levy on the taxpayers of the municipality for the year 1928 for use for this purpose is the sum of $1,035,700.

The case has been very carefully prepared by the respective counsel on all sides, has been zealously, ably and fully presented in oral argument covering over ten hours on two respective days devoted almost exclusively to oral presentation. Subsequent to submission, counsel on both sides have filed elaborate briefs, reply-briefs and sur-reply briefs in rapid succession. All of which briefs have been carefully read by the Court and most of the cases cited on each side have been examined, together with such additional examination as this Court has been able to make consistently with the pressure of trial work, including two extended trips to the Peabody Library.

Briefly, the question narrows itself to two main contentions:

1st. The jurisdiction and right of the Court to review the evidence or to take testimony.

2nd. The validity of Sec. 9, of the Ordinance of 1926, with reference to the Enabling Act of 1924, Ch. 411.

I will, therefore, in my consideration of the question, treat it under two chapters; part one, dealing with the jurisdiction of the Court to review the facts; and part two, a consideration of the legality of the ordinance (especially Sec. 9) with relation to the Enabling Act of 1924, and in connection with part two briefly review the general nature and scope of what may be called social legislation during the past 25 years or more, of which the present public service retirement system is but another chapter in the general book which is now in the process of making.

## PART I.

*Can the Court review the facts? Yes, and enjoin payment of the pension if found to be "arbitrary," "fraudulent" or "without warrant of law."*

It is contended by the city that the Court is wholly without jurisdiction to either review the findings or to take additional testimony on any question of fact, which, it is claimed, is a duty committed exclusively to the board of trustees of this pension or retirement fund, and that their decision is FINAL, without right of appeal or right of review.

As an abstract proposition, this cannot be true. The illustration used in argument perhaps is sufficient answer to this contention. It was there suggested that if Mr. Bell, as City Register, had been expressly authorized by a formal resolution of the board of finance to examine and report upon the securities of the city held in the safe deposit vault of one of the trust companies, and that while so doing the wall or ceiling of the vault fell in upon him and killed him while thus discharging his official duties, and that if upon this evidence being brought to the attention of the board of trustees of the retirement fund they decided he was *not* killed while in the performance of official duty, and that, therefore, they disallowed his pension, that under such circumstances application could be made to the Court by

mandamus, or otherwise, to compel the trustees to take appropriate action on the undisputed facts and authorize the issuance of the pension. Would the Court in such case be powerless to act? Certainly not.

As said by Mr. Justice Brandeis in B. & O. vs. U. S., 264 U. S. 258:

"To refuse to consider evidence introduced or to make essential finding without supporting evidence, is arbitrary action."

The Courts are the legal safeguards against *"arbitrary"* action of boards.

"Review by injunction proceedings or certiorari is among the commonest of all the modes of testing administrative determinations." "Administrative Justice," by Dickenson, p. 309.

"While a statute may not in terms make any provisions for a review of the proceedings of a particular administrative body, it does not follow that such proceedings are beyond investigation in the Courts; through proceedings by way of injunction certiorari or mandamus, the party aggrieved may have his hearing and obtain relief." 35 Harvard Law Review, p. 128.

"While the sufficiency of evidence is a matter for the Commission to decide, yet the legal effect of it is a question of law, to be reviewed by the Court." I. C. C. vs. L. & N. 227, U. S. 88, 91.

35 Harvard Law Review, p. 787:

Extracts from articles, "The Judicial Power," by Cuthbert W. Pound:

Page 790: "The protection of individuals from the arbitrary, capricious and unauthorized exercise of power is an essential attribute of free government. The Court may not substitute its own judgment for that of the Legislature or the administrative board in determining what is fair and reasonable, but it will probably overturn any action, legislative or executive, when clearly of the opinion that such action is fundamentally or constitutionally wrong, arbitrary, capricious or unauthorized. At least the circumstance that the question is not within the purview of judicial power will be the sole deterrent of judicial relief."

Page 794: * * * The orders of administrative boards shall be in accordance with the State and Federal Constitutions; within the powers delegated to such boards; resting on law and evidence; and — considering the inter-

ests of both of the public and the corporations or persons regulated—not arbitrary but reasonable, discreet and judicious. The Courts could not, under the pretext of exercising judicial powers, consistently with the decisions of the Supreme Court of the United States, set aside orders lawfully made, for nothing is more elementary than that power to make such orders may be given to such boards even when judicial power is expressly vested in the Courts, as it is under the Federal Constitution."

One of the most illuminating cases I have been able to find in my extremely limited opportunity for independent research, because of the trial work of the pending Whitehurst litigation, is a Wisconsin case, decided in 1909, State, ex rel. McManus, vs. Board of Trustees, reported and annotated in 20 L. R. A., N. S., p. 1175. It has many marks of similarity to the instant case, in that it was a police pension case of death benefits requiring a construction of a statute as to the word "injury" in the discharge of duty and whether *"injury"* included pneumonia contracted on a trip to New York for the purpose of arresting a prisoner.

Secs. 8 and 9 of the Pension Act provided:

"Sec. 8. If any member of the Police Department, while *engaged in the performance of his active duty as such policeman, be injured,* and found, upon an examination by a medical officer, ordered by said board, to be physically or mentally permanently disabled by reason of such injury, so as to render necessary his retirement from service in such department, such board shall retire such disabled member from service; provided no such retirement on account of disability shall occur unless the member has *contracted such disability within the hours of each day or night when he is required to be on active duty by the rules of the department, or while he is engaged in the performance of 'emergency duty' during his regular 'off hours.'* * * *

"Sec. 9. If any member of the Police Department shall, while in the performance of his duty, be *killed, or die as the result of an injury received while in the line of his duty, as described in the preceding section.* * * *" his widow and minor children, if any, shall receive a pension.

The Court said:

"The word 'injury' in ordinary modern usage is one of very broad designation. In the strict sense of the law, especially the common law, its meaning corresponds with its etymology. It meant a wrongful invasion of legal rights, and was not concerned with the hurt or damage resulting from such invasion. It is thus used in the familiar phrase, damnum absque injuria, In common parlance, however, it is used broadly enough to cover both the *damnum* and the *injuria* of the common law, and, indeed is more commonly used to express the idea belonging to the former word: namely, the effect on the recipient in the way of hurt or damage; and we cannot doubt that at this day its common and approved usage extends to and includes any hurtful or damaging effect which may be suffered by anyone. Hence, unless some reason to the contrary is presented, it should be so understood in these statutes. Sec. 4971, subd. 1, Stat. 1898. The respondent contends that, nevertheless, the word should be limited to the results of external violence. By itself the word 'injury' or 'injure' has no more application to the result of violence than to the result of any other injurious influence. A disease resulting from negligence of a physician in failing to give treatment is just as much an injury in common phrase as if it resulted from affirmative maltreatment or external violence. Therefore there is nothing inherent in the word to limit the injuries to which this statute applies to those from physical or external violence. If one be tortiously exposed to extreme cold, he may suffer the freezing and consequent loss of a limb, or the chill of an internal membrane or tissue, or resultant congestion or disease. No reason is apparent why either is more or less an injury than the other.

* * * *"The purpose of the act, too, would seem to require the *broader meaning of the word.* Why is not the policeman who, in the faithful performance of his duty, exposes himself to a danger like smallpox or diphtheria infection, as worthy of provision for his disability or for his widow as one who exposes himself to the knife or the club of the lawbreaker? Why is it not as promotive of the efficiency of the force for the protection of public welfare that he be encouraged in the

one case as in the other? These considerations, and many others like them, which might be mentioned, constrain us to the conclusion that the word '*injury*' is used in this statute in a sense broad enough to include the *contracting of a disease;* provided, of course, that such injury is suffered in the course of and by reason of the performance of the distinctive duties imposed upon the suffered as a policeman.

* * * "Our view as to the legislative intent results in the conclusion that it was within the power of the board of trustees to award the pension in question if they *found that the pneumonia from which Sullivan died was contracted in the actual performance of his duties, and caused thereby. Their resolution of that question of fact from the evidence before them was within their jurisdiction, and cannot be reviewed upon certiorari.*" 20 L. R. A., N. S., 1176. (Italics mine.)

Would there not be ample opportunity here for reasonable minds to honestly differ in the application of a legal standard to the facts of this case? The legal standard being *"injured"* in the course of duty. All minds might not agree that contracting pneumonia while travelling to New York on business was being *"injured"* in the performance of duty.

The following case was cited in argument, illustrative of when one is *not* entitled to a pension:

In McAuliffe vs. Policemen's Pension Fund (Ky.), 115 S. W. 808, it was held that where a policeman, while at his home, and not on duty, undertook to clean his pistol, and in so doing accidentally killed himself, his widow was not entitled to a pension under a statute providing for pensioning the widow or children of any officer, member or employe of the Police Department who "shall, while in the performance of his duty, be killed or die as the result of an injury received in the line of his duty."

As further illustrative of the proposition that acute legal minds may differ in the application of facts to a legally prescribed standard:

In Gummerson vs. Toronto Police Benefit Fund, 11 Ont. L. Rep. 194, it was held that an injury sustained by a policeman while vaulting over a wooden horse in a gymnasium (this being part of a manual exercise prescribed by an inspector in the police force) was received while engaged in the execution of his duty, within the meaning of a rule of a police benefit fund, providing for pensioning policemen who receive injuries *in the execution of duty.*

A lay or even a legal mind might honestly conclude that a policeman whose duty it was to have his firearms clean might. while cleaning his police pistol for police use, be considered "as engaged in the performance of police duty" in so cleaning his *official weapon.* If a board of pension trustees, concluded one way or the other, it seems to me they might be acquitted either of "fraud," or "arbitrary action," requiring judicial review and legal reversal of their deliberately formed, and honestly arrived at, conclusion—even though *some* judicial mind might think otherwise.

The board of trustees of the retirement fund carefully scrutinized all the facts apparently obtainable and thereupon concluded, on the entire history before them (undisputed) that t h e City Register, J. Archer Bell, began his official business that day at 9.10, and that while on the way from one official visit to the City Hall to engage in further official duty, he was struck and killed by an automobile near the northwest corner of the Courthouse.

In the absence of fraud, or arbitrary action on the part of the trustees, to whom alone is committed this duty (subject to implied judicial authority to review *arbitrary action* or set aside fraudulent findings), I do not think the Court would be warranted in substituting in each such case the judicial mind for the administrative mind, to whom this duty of determination is primarily committed. The law did not contemplate the *finding of fact* to be made by the judge, instead of by the trustees. It seems to me it should be interposed only in those cases where the conclusion of the judge would not be a mere conclusion of fact, but a legal and judicial determination of the facts as a legal question distinct from a jury question.

I think the following authorities, though on different facts, support this general conclusion.

Baltimore vs. Flack, 104 Md. 121; Funeral Directors vs. State Board, 150

Md. 294; Henkel vs. Millard, 97 Md. 24; Manager vs. Board, 90 Md. 659, and other Maryland cases of the same general class.

On the record in this case, and on the testimony taken, this Court will not attempt to substitute its conclusion for the finding of the trustees, whatever legal fiction it may be to say that J. Archer Bell as City Register was actually engaged in the performance of official city duty at a little after 9.10 A. M. the morning he was killed. It is not more finely attenuated than some of the cases found in the law books under the workman's compensation laws in the various States, under somewhat similar provisions. The question of fact presented is one on which honest minds may well differ. Honest and acute minds *did* in fact differ. The conclusion of the board of trustees was by a majority vote only, a divided vote of 3 to 2.

The important fact is that t h e i r minds were acute, and their differences honest, deliberately arrived at, after careful investigation of all the facts. In no legal sense was their action *arbitrary*, or their findings mere fiat conclusions—unsupported by evidence.

## PART II.

*Is the Ordinance No. 553, Feb. 1, 1926, Sec. 9 (accidental death benefits) broader than the Enabling Act of 1924, Ch. 411, authorizing "general system of pensions and retirement for its officers, servants, agents and employees?"*

In attempting to properly construe the Act of 1924, Ch. 411, we must first seek to ascertain the legislative intent (indulging in every legal presumption possible in favor of the constitutional exercise of legislative authority).

When 'our Court was called on to construe the provision in the Bill of Rights, guaranteeing the right of jury trial' (Margaret Glenn case, 54 Md.), it was intimated that to ascertain the intention of the framers of that provision, we must step back in legal history to the *age* and the *times* when the provision was incorporated in the organic law. That the right as then spoken of was the right as *then* known and understood—the right as then existing at common law which it was thought desirable to preserve, and

there was no intention to give a future vested right of jury trial in all cases, but only as then known, exercised and enjoyed.

Therefore, by the same analogy, when the Maryland Legislature in 1924 provides that the municipality may enact for its members a *"general pension and retirement system,"* at its own expense, in order to determine what it had in contemplation, by the use of the term *"general pension and retirement system,"* not only the condition of law and public thought in that era are to be taken into consideration, but also how the terms used are generally understood in connection with the subject matter with which the Legislature was attempting to deal.

During the last 25 years, and never more so than *now*, there has been a legal renascence in public social law. The country, because of great industrial growth and consequent necessity, is definitely committed to a large program of this general character. A mere bird's eye review will suffice to illustrate my meaning.

### The Socialization of the Law.

Courts are ever potent to protect the constitutional guarantees of liberty nothwithstanding the process of socialization of the law. With the ever increasing demands of our complex society, and cosmopolitan population, with its industrial activity and mass production, social law is still in a state of flux.

The close technical legal reasoning of the judicial minds of the Elizabethan period are ill adapted to the constructive legalistic thought required for the industrial world of the 20th century. The concept of personal liberty, private property and personal security while still recognized in the abstract, must admit of reasonable limitations, in the public interest, because of constantly changing conditions of society.

The power of the State must be exercised in regulating and promoting not only public health, morals, education, safety, but also the general welfare.

Barber vs. Connally, 113 U. S. 27, 31.

"It is familiar law that even the privilege of citizenship and the rights inherent in personal liberty are subject in their enjoyment to such reasonable

restraints as may be required for the public good."

Holter vs. Nebraska, 205 U. S. 34, 42.

Our very home, even though boasted of in the law as our "castle" may be taken from us "if the State hath need of it," either for a playground, park or public school, or for other public purpose — subject only to the requirement of making due compensation therefor. Even this limitation is not *universal.* To arrest a great conflagration, it may even be taken without compensation. Some of us recall the memorable Sunday in February, 1904, when the municipal authorities were debating the wisdom of dynamiting the block of the Rennert Hotel, as means of saving the whole northern section of the city. The sudden shifting of the winds made the decision, and carried the conflagration eastward to the waterfront.

Diseased cattle may be taken and killed. (50 N. J. L. 308.)

Trees with dangerous infection may be cut down and destroyed.

Quarantines established (181 U. S. 248). Factory nuisances of noise and odors, eliminated, regardless of financial loss (29 Cyc. 1185). All sorts of public safety regulations may be enforced (95 U. S. 465). Our passage on the public highway is by the red, yellow and green route, subject to constant interruption (29 C. J. 649).

Game laws, with seemingly arbitrary and varying restrictions, are more or less familiar to the sportsmen, and serve as *minute* illustrations of the ever increasing restrictions on the abstract concept of the right of *personal liberty.*

We are not even free to *contract*—unreservedly, but only with regard to legal subject matters, and then, n o t counter to declared public policy. Williston Contracts, Vol. 3, Sec. 1628.

Freedom of speech and freedom of the press go hand in hand with the right of personal reputation, itself as fully respected as the right of l i f e, liberty or property. (Detroit Free Press, 72 Mich. 560).

In the great world of industry, the law recognizes, or creates, the distinction between private enterprise, and those *charged with a public interest.* From time to time, the law, as conditions change it, promotes to membership in the latter class, recruiting from the former. To that end, and for the more efficient regulation thereof, our Legislatures establish Public Service Commissions, Interstate Commerce Commission, Boards of Public Health, Zoning Boards, Boards for Medical Examination, Undertakers, Electrical Boards, Boards of Pharmacy and so forth, almost without end.

Perhaps the most noticeable illustration of recent social industrial legislation may be found in the Workmen's Compensation Commissions, beginning with the first successful product to run the gamut of the Courts, in the Washington State law in 1910. Others rapidly followed in its wake. In a few years, legislation of that character swept the country, took all the legal hurdles, not without some spills, but with immediate remounts, this branch of social legislation is now firmly established in 43 States and three Territories. In a short span we have witnessed the funeral procession, in industrial life, of the corpse of "assumed risk," "fellow-servant" and a l a r g e part of "contributory negligence" law. Automobile accident will be the next to be interred in some legal grave, where the theory of *compensation* to the injured will supplant the doctrine of *"damages"* against the negligent or reckless. They are now making cultures for it in the New York legal laboratories, and studying the nature of this legal germ.

The poor we always have with us. Hence society today is studying the problem, not only of the flotsam and jetsam of industrial life, and trying to eliminate its almshouses and eleemosynary institutions, but has, as above indicated, devised ways and means by which the *industry* assumes the burdens of its own wreckage, the cost being thus absorbed by society as part of the overhead of the business.

The New York Act went through a fierce legal attack, both in the Courts and public journals. It was said that workmen's compensation would foster a system of guardianship for freemen, and dole out to them *pensions* as wards of the State. That it would deprive freemen of the opportunity to enforce their rights in Courts, and deny them the proud boast of the common law, the right of trial by jury. The Ives case (201 N. Y. 271) was declared unconstitutional (about 1911). But the pendulum has swung the other way. This character of legislation has swept

the country. Is firmly established in nearly every State and Territory, and the legal controversy now in the state of flux growing out of it, is not the validity of the law or its wisdom but the extent to which the judgment thereunder in one State, is entitled to full faith and credit in a *sister State*, and the extent of its enforcibility, *as a judgment*, in foreign countries.

Constitutionality of these Acts is fully annotated in Anno. Cases 1912 B. 174; 1915 A. 247; 1916 B. 1286; 1918 B. 611, etc.

Laws requiring corporations to furnish testimonial letters to retiring or discharged employees, certifying t h e length of their service, and nature and cause of their leaving, etc., upheld in Prudential Ins. Co. vs. Check, 259 U. S. 530.

Child labor and minimum wage laws are other subjects of social legislation and whether in the domain of Federal or State legislation, is a question to be resolved by the statesmen of the country. Social regulatory measures of a satisfactory nature are bound to follow on these lines.

The Harrison Drug Law and white slave laws (Mann Act) are even more extreme examples of the socialization of the law.

Society has been the gainer by such legislation. The next step in the march of events has been the many and various forms of beneficial retirement provisions. Of course, from a very early period, we have had, both in this country and in England, the old line pension system for soldiers and sailors. The present law is but the adaptation of that general idea to modern *public life*.

"Old Age Dependence," by Lee Wellington Squire (1912) (Peabody Library No. 331,25.s773), gives the early history of police pensions or retirement funds, and sets forth some of the false principles from which some of these funds are recruited, as having no proper relation to the subject matter, and others as having a direct evil tendency, such as percentage of money from liquor licenses; billiard tables and pool rooms; peddlers' and hucksters' licenses, dances and entertainments; gratuities received by police for discharge of duty; fines on members for neglect of duty; witness fees where allowed policemen."

See also "Public Service Retirement Systems," Monthly Labor Report, Vol. 25, No. 2, August, 1927 (published by U. S. Gov't Printing Office, Washington, D. C.), containing comprehensive account of Municipal Employment System of Philadelphia organized in 1915.

European System for Relief of Unemployed. Dr. Fritz Rogner in December, 1927, issue of International Labor Review.

Unemployed Industrial Insurance said to be effective in 19 countries covering 45,000,000 workers, with Austria, England and Germany on actuarial basis, with payment of benefits for a limited period.

Also a Public Service Retirement System in Austria, under the laws of 1914, 21 and 24, and in Germany, Belgium and Czechoslovakia.

The most conveniently arranged and practical book, however, is "Principles Governing Retirement of Public Employees," by Lewis Meriam (1918) (Pratt Library No. T.65807), cited in argument by City Solicitor.

On pages 38-9 the author says:

"Government in its own interest, must guarantee to its employees reasonable permanence of tenure, and that to eliminate the losses from superannuation and disability, which follow from permanence of tenure, it m u s t establish an adequate retirement system.

"An adequate retirement system may be defined as one that fulfills the requirements of that branch of the public service to which it applies and is at the same time fair to the employees as a class and to the individual employees, satisfactory to a public appreciation of the social value of such a system, and financially sound."

Meriam Principles Government Retirement Public Employees, pp. 38-9 (Pratt Library No. T.65807.)

See also article "Old Age Pensions," American Bar Journal, February, 1924.

We still have our Bay View and county almshouses. Also our annual charity drive for a million dollars for the Community Fund to be yearly absorbed by the more prosperous persons of Baltimore! The modern thought is a move in the direction of the elimination of these institutions, and the reduction of the necessary demands **for the Community Fund.**

The Arizona Act of 1915 struck crudely, but directly, at the objective, to wit: abolishing the almshouse. The Act was declared unconstitutional, not because of the *principle* of *old age pension*, but because of its indefinite and impracticable character, *as a piece of legislation*, which provided for the *sale of* the almshouses, and the use of the money toward a fund for pensioning of old age, without making any provision for certain other persons, not embraced in the pension class, but who would reach the old age class and, when destitute, require the use of the almshouses.

This brings us to the starting point that there is nothing vicious in the principle underlying a comprehensive system for the retirement of municipal or public employees, but is economically sound and socially beneficient.

There is a series of learned articles written by different authors on *"Ethics in Public Service,"* Vol. 104, Am. Academy of Political Science (other articles on ethics of various professions, trades, etc. "Judicial," "legal," "medical," "public librarians," "advertising," etc.). The particular one having direct bearing here, is by W. C. Beyer, Assistant Director Municipal Research, Philadelphia. It presupposes necessity for merit system vs. spoils system, organization of public employees for the establishment of a good morale, the payment of a living wage; *the benefit of a reasonable degree of freedom from economic want.* Hence the public wisdom of a system of deferred payments, or "pension," or "retirement system," etc.

So much, then, for the general trend of public, judicial and legislative thought throughout the country, at the time the legislation in question was passed (1924).

(1) As to the proper understanding of the *descriptive* terms invoked. Political science journals, legal literature, text writers on social law, official and scientific government publications, political economy treaties, are teeming with discussions of the relative merits or demerits of particular "Public Service Retirement Systems." The very term itself has become socialized; like Mt. Hope *Retreat*, or other "Rest Homes." Patients are no longer "Insane," they are *"mentally disturbed;"* they are not now "locked up," they are *"detained for observation."* The bars are just as thick as they used to be, but the descriptive terms, *less harsh.*

Though freely using the appropriate and accepted term of *"Retirement System,"* the legislature was taking no chance on the Court's "Social" Education, so, in addition thereto, it used the term *"General System* of Pensions." *A general* system, includes all subdivisions of the class.

Complainant contends that pension is necessarily personal. Not so. It may, or it may not be personal, depending upon the class to which it belongs at any given time. Pensions may be for life, or for years; full pension or partial pension, absolute, or conditional, compulsory or elective, dependent wholly on State or City for creation of the fund, or wholly on contributing members, or both. Authority to enact a *general* pension system, left the grantee power to select its own *variety*, or any combination of various varieties. Otherwise the system would not *be general*, but *special.*

(2) The word Pension, what does it now, or did it ever mean?

The French word *pon-sion* is of the same origin — indicating a place of lodging — Inn, etc., or boarding house, where one can be cared for.

Standard Dictionary:

*Pension.* "A periodical allowance to an individual — *or to those who represent him,* on account of past services—or some meritorious work done by him —especially such an allowance made by the government."

*Pensions.* 19 R. C. L., page 726, Section 33, says: "The establishment of a pension system for municipal officers and employees, whereby, after serving a certain number of years or upon disablement from injuries received in the course of their duties, they are retired from active service and paid a certain proportion of their salaries for the remainder of their lives is not an unconstitutional disposition of public moneys for private use when applied to officers and employees who have entered or continued in the service after the system went into effect. The pension in such a case is not a gratuity, but a part of the stipulated compensation. A judiciously administered pension fund is doubtless a potent agency in securing and retaining the services of the most faithful and efficient class of men connected with those arms of the municipal service in which every property owner and resident of the city

is most vitally interested. Reasons in support of this proposition need not be stated in detail. *They are such as readily suggest themselves to every reflecting mind.*"

Dr. Samuel Johnson in the first edition of his celebrated dictionary (Peabody Library No. L5.51) defines *Pension as* (1) *"an allowance made to one without any equivalent. In England it is generally understood to mean pay given to a State hireling for treason to his country."* (2) *"A charity bestowed on the education of young subjects."*

*"Pensioner."* *"A slave of S t a t e hired by a stipend to obey his master."*

The earliest use of the word quoted by Dr. Johnson is the lines of Pope: * * * *"a friend to men in power without pensions."*

A payment of *rent* is, however, its much earlier meaning (one entirely overlooked by Dr. Johnson) : "a small temporary *pension* for a vast freehold." *Borrow,* vol. 111. s. 15.

It was natural that Dr. Johnson should have experienced some embarrassment in view of these definitions, in his dictionary then current, when, in 1762, he yielded to the seduction of accepting an annual pension from George III of 300 pounds.

Boswell tells us that Dr. Johnson first consulted Sir Joshua Reynolds as to the propriety of his accepting the pension, and as to what would be expected of him on acceptance, but on assurance from Lord Bute that it was *"because of what he had done in the past, and not what was expected of him in the future,"* he yielded, and hence became a pensioner of the Crown.

The more modern Century Dictionary defines *"Pension"* as : (a) "a stated payment to a person *in consideration of the past services* of himself or some kinsman *or ancestor;*

(b) "Periodical payment made to a person *retired from service* on account of age or other disability;

(c) "A yearly sum granted by a government *to retired public officers;* to soldiers or sailors who have served a certain number of years, or have been wounded; to families of soldiers or sailors *killed or disabled,* or to meritorious authors, artists or others."

" 'Tis no. matter if I do halt:

I have the wars for my colour,

And my *pension* shall seem the more reasonable."

Shakes., 2 Henry IV, 1, 2.

Viewed therefore, either from the standpoint of the public thought at the time of the passage of the legislation, or from the definition itself, of the terms used, either expression ("Pension" or "Retirement System"), would, by its very terminology, *include* dependents or representatives, unless otherwise *excluded.*

It would seem to me therefore that the argument is without force, that the ordinance is void as to Sec. 9, referring to accidental death benefits, as being broader than the enabling Act. On the contrary I think the provisions in Section 9 of the ordinance, well within the power granted by the Legislature to the municipality, and entirely embraced within the scope of the title, as well as within the *Act itself.*

Reference was made in argument to the Firemen's Pension Law, Act of 1880, Ch. 409 and 1884, Ch. 312. The title of the Act contains no reference to any death benefits, or payments to widows or dependents, yet the body of the Act *does* make provision for them —Act for Relief of Disabled and Superannuated Firemen. Nearly half a century has passed since that enactment, and more than $1,500,000 has been paid in pensions under it, to firemen and widows of firemen.

Soon followed in 1886, the Police Pension Law for Baltimore City. Over $3,500,000 has been paid out in pensions under this Act. About $500,000 has been paid out, since 1926, under the present ordinance (Employees' Retirement System), of which over $100,000 was on account of *death* benefits.

It seems to me legal infirmity, of a serious character and definite and certain in nature, would have to be established in the legislation in question, before any Court would feel warranted in striking it down. I find no such infirmity and no such legal justification.

### Other Similar Legislation.

Legislation of like general character, with similar title provisions, in States with constitutional requirements as rigid as our own, may be referred to

in passing: The Boston system, Laws 1922, Ch. 521.

"An Act Providing Retirement Allowances Based on Annuity and Pension Contributions for Employees of the City of Boston." (The system includes death benefits).

Rhode Island: Act 1923, Ch. 489, "Act to Provide for the Retirement of Employees of the City of Providence." (Language deemed broad enough to include death benefits).

*New Jersey.* Act of 1921, Ch. 109: "Establishment of an Employees Retirement System for the Employees of New Jersey." (Included death benefits).

*New York.* Act 1920, Ch. 427: "Retirement System for Officers and Employees" (included death benefits). Constitutional provisions there, similar to ours (as to subject embraced in Act shall be reflected in title). Sec. 16, Const. N. Y.

With these various statutes, presumably within the knowledge of the Maryland Legislature when it adopted similar provisions, in providing for the same sort of relief recognized by our Legislature, is it not a cogent argument that they fully realized that death benefits are included within any general system of relief, and any "general pension system?"

My conclusions, therefore, are, as to the first proposition:

That the Court has jurisdiction to review the evidence, to the end that it may be ascertained (a) whether the action complained of is fraudulent; (b) arbitrary; (c) without warrant of law.

Finding none of these elements present, the Court should not and can not substitute its conclusions (should they be different), from the findings of the Board of Trustees to whom alone is committed this *administrative duty.*

II. (a) That the ordinance No. 553, Feb., 1926, as to Sec. 9, providing for death benefits, is not broader than the terms of the enabling Act of 1924, Ch. 411, and is not therefore void for that reason.

(b) That the title of the Act sufficiently describes the subject matter, and that the term "General System of Pensions and Retirements, etc.," is broad enough to include accidental death benefits.

(c) That the bill should be dismissed with costs.