William N. DAVIS, Respondent,

v.

NASH CENTRAL MOTORS, a Corporation, Appellant.

No. 23032.

Kansas City Court of Appeals.

Missouri.

Jan. 11, 1960.

Richard K. Phelps, Kansas City, for appellant.

Preston H. Longino, Byron E. Mintonye, Kansas City, for respondent.

MAUGHMER, Commissioner.

Plaintiff William N. Davis had a verdict and judgment in the amount of $350 actual and $5,000 punitive damages against defendant corporation. His claim is based upon the alleged wrongful taking and conversion of his 1951 Nash automobile, including tools stored therein. Since defendant on appeal questions if the evidence was sufficient to justify submission, and because of the punitive damages issue, it is essential, we think, that the facts be presented and reviewed quite fully.

In the latter part of July, 1957, plaintiff purchased the automobile in question—a used 1951 Nash—from defendant at its 63rd Street and Troost lot, Kansas City, Missouri. The purchase price of $295 was fully paid through a $100 trade-in allowance and $195 in cash, plaintiff having borrowed this sum from Murphy Finance Company. The written sales agreement recited that the car was bought "as is", although plaintiff said he did not notice that provision at the time. It was plaintiff's testimony that he immediately had difficulties in operating the vehicle. He said that before he got home the water boiled; that he put in more water at a filling station; that it boiled again; that he called defendant and was advised that the thermostat had stuck, so he bought a new one and had it installed. He said the brakes "went out" a few days later and "wouldn't hold"; that he took the car back to defendant's lot, where a one-armed mechanic, whose name he did not know, adjusted the brakes. Some two weeks later the engine became very noisy. He took the car to defendant's main office at 45th Street and Troost, where he talked with the shop foreman, who told him a whole new set of pistons was needed. Plaintiff says he told the foreman to "Go ahead and fix the

car". He then talked with Mr. Claude R. Freeman, general sales manager, who told him the company would bear no part of this repair expense. Plaintiff then saw Mr. Lester E. Johnson, office manager, and tried to work out an arrangement to pay this repair bill, which amounted to $182, through monthly payments. Plaintiff testified that Mr. Johnson told him he would have to pay the whole bill in cash. Plaintiff says he returned to the shop later in the day, told Mr. Johnson: "I have to have my car in the morning" and Mr. Johnson replied: "You can go ahead and get your car and we will have to settle this later". Plaintiff's version is that he then "got in my car and drove off". Plaintiff's narrative thus far is not materially disputed by defendant or by its witnesses, Mr. Johnson and Mr. Freeman, except they deny that plaintiff was given permission to drive the car away without paying the repair bill, and they disclaim knowledge as to just when or how the car was removed from the premises. Mr. Johnson did state, however, that after he became aware that the car was missing, there was a conference participated in by himself, Mr. Freeman and Mr. Barnes, owner of the business, and he shortly thereafter called Mr. Robert L. Stone, d/b/a as Bonded Adjustment Service, gave him a description of the automobile, including license number, plaintiff's name and address, and employed him to "locate the car". The agreed fee for this service was $45.

Robert L. Stone, operating as Bonded Adjustment Service, was in the business of adjusting automobile credit accounts. His testimony was that Mr. Johnson "wanted his car back, that is what he said". He stated that his only contact with the defendant thereafter was "to advise them of the status of the account". He said he called Mr. Johnson the morning after his first meeting with plaintiff, and reported.

The record shows (testimony of plaintiff and Mr. Stone) that Mr. Stone alone or with "his partner" made three unsuc-

cessful and a fourth successful effort to gain actual possession of the automobile. Stone first called at plaintiff's home, 8200 Sterling, Raytown, Missouri, and endeavored to persuade plaintiff to drive the car to defendant's lot. Plaintiff says Mr. Stone at that time told plaintiff he was a deputy sheriff. Plaintiff refused to go and suggested they go instead to the office of the Prosecuting Attorney. Mr. Stone did not agree with that suggestion and left with his mission unaccomplished. A few days later Mr. Stone's partner saw the automobile parked at 31st and Woodland, got the hood up and was trying to get the car started. Before he was able to get this done, plaintiff, Mr. Stone, who was apparently not far away, and a police officer came upon the scene. After a discussion, Stone and his partner left without the car. A few days later, after plaintiff returned from work, he observed a man "leaning inside his automobile". The hood had been raised and the man was working with a wire in the engine. It developed that this man again was Mr. Stone's partner. He called Stone, plaintiff called the police, and both arrived at about the same time. Plaintiff said the partner told him he was taking the car back to Nash Motors. After some discussion with plaintiff, Stone, his partner and the police participating, Stone and his aide withdrew, again without possession of the automobile. A few more days passed and plaintiff, upon returning from work one evening, parked the automobile in his private driveway next to his house. When he got up the following morning, September 6, 1957, and looked out, the car was gone. He said he had some tools worth $50 to $75 in the car. He called the sheriff's office and reported that the automobile had been stolen. It developed that it had been taken away during the night by Mr. Stone and his partner. We summarize the details of that occurrence as recounted by Mr. Stone. He said he had been employed by Mr. Johnson, defendant's general manager, to "handle the account" of plaintiff; that "the

car had disappeared and he wanted it back". This was his only employment by Nash Motors. He said that no one for Nash Motors directed or controlled his conduct in the handling or adjustment of this account. He admitted that on the night in question, some time after midnight, he and "his partner" pushed the automobile from where plaintiff had left it parked, to his partner's house and later they took it to "one of the dealer's lots". He said that they did not knock on plaintiff's door or do anything to attract his attention, or ask his permission to take the automobile.

Plaintiff, a few days later, called at defendant's lot and requested return of the automobile. His request was refused and as Mr. Freeman, defendant's general sales manager, stated at the trial, "The car is, was and still is in our custody". Although no witness knew or admitted or testified as to just when or how the automobile was moved from Stone's storage lot to defendant's, the fact remains that it did get there, that such was Stone's ultimate object in taking the car, and that defendant refused to grant plaintiff's request and demand for its return.

■ Defendant filed a motion for directed verdict at the close of plaintiff's case. It was overruled and defendant lists that action as its first assignment of error. After this motion was overruled, defendant went ahead and offered evidence. It thereby waived the point. Lindsay v. McLaughlin, Mo.App., 311 S.W.2d 148; Wilt v. Waterfield, Mo.Sup., 273 S.W.2d 290, 294; Daniels v. Smith, Mo.Sup., 323 S.W.2d 705, Section 510.280 RSMo 1949, V.A.M.S. True, defendant renewed its motion at the close of all the evidence, and that motion too, was overruled, but defendant on appeal does not complain of this action. However, its second assignment is that the evidence is insufficient to sustain the verdict and judgment. In considering and ruling this assignment we shall, in effect, likewise determine if a motion at the close of all of the evidence should have been sustained. In addition to questioning the sufficiency of the evidence to justify submission on either actual damages or punitive damages, defendant asserts that even though Stone was its employee he was, nevertheless, an independent contractor, rather than an agent, and defendant is not responsible or liable for his unlawful acts. Defendant also contends that the giving of Instruction Five A was error. It makes no claim that the amount of damages allowed, either actual or punitive, is excessive.

■■ We have set forth the facts and the evidence rather fully. We have no hesitancy in saying that the actions of Stone and his partner,—their four attempts to secure possession of the automobile,—were improper. Defendant does not really assert the contrary and since it benefitted from the unlawful taking, received and still holds the automobile even after demand for its return, is, we think, guilty of conversion.

Plaintiff's main Instruction One required the jury as prerequisites to a plaintiff verdict to find that (a) defendant permitted plaintiff to remove the automobile from defendant's premises; (b) defendant "caused Stone to take the automobile from plaintiff's home during the nighttime and against the will of plaintiff" and (c) that defendant has kept and retained possession against the will of plaintiff. It is stated in 2 C.J.S. Agency § 30: "The scope and extent of an agency depends on the terms of the agreement and the intention of the parties, * * *".

■ Defendant now insists and Mr. Johnson in a measure so testified, that it employed Mr. Stone for the sole purpose of *locating* the car and that such was the full extent of his authority as their representative. As we read and consider the evidence, we seriously doubt if their representative was so restricted. There is every reason to believe that defendant already

knew the location of the vehicle. Stone's business was not just to locate automobiles. Besides he made reports from time to time to defendant covering his "handling of the account" and the whole relationship is topped off by the fact that defendant accepted possession as secured by its representative and refused to relinquish, even after plaintiff's demand. The jury found, and was justified in finding, under these facts, that defendant caused and authorized Stone to take possession. It should here be noted that in determining the sufficiency of the evidence to support a judgment plaintiff is entitled to a review of all the evidence in the light most favorable to plaintiff, giving him the benefit of all favorable inferences and disregarding defendant's evidence unless it aids the plaintiff's case. Mincielli v. Sloan's Moving & Storage Co., Mo.Sup., 303 S.W.2d 17, 19 and Daniels v. Smith, Mo.Sup., 323 S.W.2d 705, 706. Defendant says plaintiff in his brief has incorrectly stated the evidence, has presented unjustifiable conclusions and points to asserted instances thereof. We simply state that we have read the record, have set forth the evidence in some detail and we are acting upon the facts as the same are recounted herein.

In Spitzengel v. Greenlease Motor Car Co., 234 Mo.App. 962, 136 S.W.2d 100, the plaintiff had purchased an automobile from defendant's salesman Parks. Later a misunderstanding arose as to whether or not there was an unpaid balance still due. Defendant thought there was, and plaintiff thought there was not. It later developed that nothing was due but in the meantime defendant's representative Parks came to plaintiff's home and repossessed the automobile over plaintiff's objection. It was held that defendant company was responsible for the acts of its representative Parks and was liable for both actual and punitive damages.

In Hussey v. Ellerman, Mo.App., 215 S.W.2d 38, defendant furniture company had sold some furniture to one Cloudy, but neglected to file its chattel mortgage of record. Cloudy sold the articles to plaintiff. Defendant company employed Edward Nixon, a deputy constable, to locate the furniture. He repossessed it, taking it from plaintiff's home over her objections. The St. Louis Court of Appeals affirmed a judgment for both actual and punitive damages.

Detmer v. Miller, Mo.App., 220 S.W.2d 739, 741, was another action in damages for alleged conversion of an automobile. There was a dispute between the parties over an alleged unpaid balance. Defendant's son "admittedly acting for his father and at the latter's direction" had taken possession of the automobile and driven it to defendant's garage. A verdict and judgment for both actual and punitive damages was upheld.

It is true that in these cases just referred to the representative's agency or authority to act for his employer or principal was not specifically questioned. However, it seems to be implicit in these cases that such questions were properly submitted to the juries and their findings that the representatives were acting for the employers were approved. We believe that in our case the question was properly submitted to the jury and the evidence is sufficient to uphold its finding.

■ Now as to Instruction Five A. This instruction was given in clarification of Instruction Five, as offered by defendant, which, in effect, told the jury that if Stone was acting as an independent contractor, the defendant would not be liable for his unlawful acts. Defendant insists that the instruction is erroneous because it did not require a finding that defendant "had knowledge of all the circumstances surrounding the acts of Robert Stone". We set out Instruction Five A verbatim:

"The court instructs the jury that even though you find that Robert L. Stone, doing business as Bonded Adjustment Service, was not the agent of defendant, but was an independent

contractor, as mentioned in these instructions, and if you further find that after Robert L. Stone, doing business as Bonded Adjustment Service, took possession of plaintiff's automobile, if you so find, and that thereafter Robert L. Stone, doing business as Bonded Adjustment Service, delivered plaintiff's said automobile to the defendant, if you so find, and that thereafter defendant refused plaintiff possession of said automobile and retained said possession of said automobile to itself, and against the will of plaintiff, if you so find, then you are instructed that such withholding of possession from plaintiff amounts to defendant's ratification of the acts of Robert L. Stone, doing business as Bonded Adjustment Service, and makes the acts of Robert L. Stone, doing business as Bonded Adjustment Service, in taking plaintiff's said automobile, the acts of the defendant".

We believe the instruction told the jury that even if they found that Stone was an independent contractor, nevertheless, if he took possession of the automobile, delivered it to defendant, and defendant refused plaintiff's demand for possession and retained possession against plaintiff's will, such withholding of possession makes the acts of Stone *"in taking plaintiff's said automobile, the acts of defendant"*. Certainly thereafter, defendant became an active participant in the conversion.

In Detmer v. Miller, supra, 220 S.W.2d at pages 744, 745, the court said: "Where a defendant comes into the possession of property lawfully or rightfully, as, for instance, in the case of a bailee, a demand for its surrender is essential in order to constitute its further retention a conversion. Where, however, the property is taken from the plaintiff against his will and in open defiance of his title and right to possession, there is a conversion by virtue of the act itself, and no demand is necessary to make it so. (Citing cases)". We do not believe that the giving of Instruc-

tion Five A was improper or constituted reversible error.

A controversy has arisen from certain allegations in the pleadings and various statements in defendant's reply brief relative to the rights of Murphy Finance Company to the automobile and the part it had in this particular lawsuit. Plaintiff has filed a motion to strike parts of defendant's reply brief, and accompanied the motion with exhibits which include a chattel mortgage, promissory note and parts of the record from a magistrate court lawsuit. Insofar as our litigation is concerned the issues or defenses suggested thereby were not developed at the trial, are not a part of the trial record proper and we shall not in this opinion further discuss the matter.

■■ We now consider the question of punitive damages and whether or not such issue should have been submitted. In Hussey v. Ellerman, supra, 215 S.W.2d 41, the court adopted and approved a definition of "malice" as it must exist before there is a basis for punitive damages: " 'Malice, as a basis for punitive damages in a case of this character, means the intentional doing of a wrongful act without just cause or excuse. This means that defendant not only intended to do the act which is ascertained to be wrongful but that he knew it was wrongful when he did it. There must be, in order to justify punitive damages, some element of wantonness or bad motive, but if one intentionally does a wrongful act and knows at the time that it is wrongful he does it wantonly and with a bad motive' ".

■ Applying the above test to the facts in the case at bar, we believe the evidence sufficient to warrant submission of punitive damages to the jury. Here defendant's only claim was under a repairman's lien, which it lost when it lost possession of the automobile. All this, the defendant must be deemed to have known. Yet, having no valid claim, defendant, through its employee Mr. Stone, either forcibly took possession over plaintiff's

protests, or it accepted such possession from Mr. Stone, and held on to possession over plaintiff's protests and demand for its return, thereby converting the automobile to its use and depriving plaintiff thereof.

In Davenport v. Midland Bldg. Co., Mo. App., 245 S.W.2d 460, 464, 465, this court undertook to distinguish and define *legal malice* and *actual malice* as follows:

"Cases defining *malice* are legion, but the generally accepted definition is that *legal malice* exists where a wrongful act is intentionally done without just cause or excuse. (citing cases). *Actual* or *express malice*, exists when one with a sedate, deliberate mind and formed design injures another, as where the person is actuated by spite and ill will in what he does and says, with a design willfully or wantonly to injure another. 54 C.J.S. Malice pp. 915–918. Missouri courts uniformly recognize the distinction between *legal* and *actual* malice. (Listing author-

ities). *Legal malice* may exist with *actual malice* or *it may exist quite independently of it.* (citing cases).

■ "It is settled law in this state that proof of legal malice alone will support a judgment for punitive damages. See authorities, supra." We think there was no error in submitting the issue of legal malice.

Defendant has not asserted that the amount of damages, either actual or punitive, is excessive. We find no reversible error and the judgment, as to both actual and punitive damages, is, therefore, affirmed.

SPERRY, C., concurs.

PER CURIAM.

The foregoing opinion of MAUGHMER, C., is adopted as the opinion of the court. All concur.