**David HANCH, Respondent,**

v.

**K. F. C. NATIONAL MANAGEMENT CORPORATION, Appellant.**

**No. 62647.**

Supreme Court of Missouri,
En Banc.

April 6, 1981.

Rehearing Denied May 11, 1981.

G. Carroll Stribling, Jr. and Gary L. Vincent, Fordyce & Mayne, St. Louis, for appellant.

Eugene H. Fahrenkrog, Jr. and Kenneth K. Vuylsteke, St. Louis, for respondent.

John Ashcroft, Atty. Gen., Jan Bond, Asst. Atty. Gen., Jefferson City, for intervenor.

MORGAN, Judge.

This appeal from the Circuit Court of the City of St. Louis was transferred to this Court by the Eastern District of the Court of Appeals prior to opinion.

David Hanch, respondent, filed suit against K.F.C. National Management Corporation, appellant, seeking actual and punitive damages for its alleged violation of § 290.140, RSMo 1978, commonly referred to as the "service letter" statute and which, in part, provides:

> Whenever any employee of any corporation doing business in this state shall be

discharged or voluntarily quit the service of such corporation, it shall be the duty of the superintendent or manager of said corporation, upon the written request of such employee to him, if such employee shall have been in the service of said corporation for a period of at least ninety days, to issue to such employee a letter, duly signed by such superintendent or manager, setting forth the nature and character of service rendered by such employee to such corporation and the duration thereof, and truly stating for what cause, if any, such employee has quit such service; . . . .

Therein, respondent alleged that the service letter he received did not state the true reason for his discharge. At the close of all evidence, appellant moved for a directed verdict which was denied. The cause was submitted to the jury which awarded respondent $1.00 actual damages and $10,000 punitive damages which was reduced to $9,999. Appellant's motion for judgment notwithstanding the verdict was denied.

Before the Court of Appeals, and this court, appellant has contended that the trial court erred in overruling its motion for judgment n. o. v., and now advances the argument that the service letter statute is unconstitutional as violative of the first and fourteenth amendments to the Constitution of the United States.

K.F.C., a/k/a Kentucky Fried Chicken, owns and operates a variety of fast food retail outlets, including Kentucky Fried Chicken, Zantigo Mexican Food, H. Salt Seafood Galleys and H. Salt Fish and Chips Stores. Respondent became employed by appellant in 1974 as a manager-trainee at a fish and chips store. He eventually became a manager. The fish and chips stores are predominantly carry-out businesses with small work crews and limited menus. In March of 1976 respondent was transferred to an H. Salt Seafood Galley on Rock Hill Road in St. Louis. The Seafood Galleys have more employees and extended menus. It is agreed by the parties that the Galley operation is more complex than a fish and chips store.

Until May of 1976 respondent's area supervisor was Lou DiGiacomo and the district manager was Dick Kaelin. In May, Mick Davis became supervisor for the area and was respondent's immediate supervisor. Respondent's work record until that time appears to have been at least satisfactory and all relationships were amiable.

During this period of time the St. Louis area was a test market for the H. Salt chain. Several fish and chips stores and at least two Galleys were in operation. As a test market, prospective franchisees often visited the stores to assess their operation. During May, one such prospective franchisee, Marshall Scott, visited respondent's Galley. Scott noticed cleanliness problems with the store and so informed respondent. Acting on Kaelin's instructions to be fully honest with prospective franchisees, respondent told Scott that the sanitation problems were caused by restrictive limits on allowable labor costs. Respondent told Scott that appellant was playing a "numbers game" with his store. It was explained that the "numbers game" was a scheme whereby overhead expenses were artificially limited to increase the profit margin. Scott was apparently irritated by these occurrences and wrote a letter of complaint to appellant's headquarters in Louisville, Kentucky. Respondent testified that shortly after Scott's visit his relations with Davis and Kaelin grew less friendly.

A few days after Scott's visit, Davis went by respondent's Galley to discuss some problems with it. Sanitation and employee morale problems were high on the list. Davis asked respondent to prepare a list of "objectives" for the improvement of the store, which he did. Respondent was thereafter allotted extra labor to clean the store and better organize food preparation. According to Davis, respondent's operation improved considerably, but that when the labor was cut back to normal, the sanitation problems reoccurred.

On June 16, 1976, Davis transferred respondent back to a fish and chips store on Woodson Avenue. Along with the transfer, respondent received a disciplinary notice

which set out several deficiencies in his performance. This notice specifically informed him that if his performance did not improve he would be fired. Respondent testified that the Woodson store was in very poor condition but did not receive the extra help he requested to correct the problems.

Upon respondent's return from vacation on July 12, 1976, he was called to Kaelin's office. Davis informed him of his termination and gave him a letter of discharge. This letter stated as the reason for the firing respondent's negative impact on employee morale causing a decline in service and profits.

Respondent then made a written request for a service letter. Pursuant to this request, Kaelin sent respondent's personnel file to corporate headquarters in Louisville. Jim Beckett, a member of the legal staff, wrote a draft of a service letter containing information he gleaned from the file. This draft was dictated over the phone to Kaelin's secretary in St. Louis. A final draft was prepared and Kaelin signed it. The pertinent portion thereof reads as follows:

> Your services were found to be unsatisfactory, and that was brought to your attention as late as June 12, 1976, June 16th, 1976, and finally on July 12, 1976, each by written memoranda, two signed and accepted by you, the last unsigned by you. The causes for your termination include poor store sanitation, poor employee-customer relations, incomplete form preparations, inadequate product to meet demand, and failure to correct those problems.

The letter was signed by Richard C. Kaelin as District Manager.

## I.

Appellant claims the trial court committed only one trial error by overruling its motion for judgment n. o. v. While appellant's argument is broken into three parts, its basic complaint is that respondent's evidence was insufficient to support an award of punitive damages.

First, appellant argues that any evidence of malice involved in respondent's termination is inadmissible to prove malice in the issuance of the service letter. In support of this argument appellant cites *Woods v. Kansas City Club*, 386 S.W.2d 62 (Mo. banc 1964), wherein this court ruled that an instruction allowing the jury to assess punitive damages for the malicious giving of an improper service letter *and* for the plaintiff's discharge was error. This court stated that punitive damages were available only for the issuance of a false service letter.

The glaring distinction between *Woods* and the present case is that in the latter, the verdict directing instruction submitted *only* the false service letter issue and the punitive damages instruction referred directly to the verdict director. There can be no question in this case but that the jury found malice on appellant's part in the issuance of the letter, not respondent's firing.

Second, appellant contends that the good faith belief of the corporate employee who drafted the letter will avoid the imposition of punitive damages upon the corporation. Appellant makes the following observations about punitive damages: (1) for an award of punitive damages to stand, the plaintiff must prove either legal malice, where the wrongful act is intentionally done without just cause or excuse, or actual malice, where the act is committed with a deliberated intent to cause injury, *Schmidt v. Central Hardware Company*, 516 S.W.2d 556, 560 (Mo.App.1974); (2) a second element of legal malice is that the actor knows his act is wrongful, *Davis v. Nash Central Motors*, 332 S.W.2d 475, 480 (Mo.App.1960); and (3) a good faith mistake as to the wrongfulness of the act is a defense to a punitive damages claim, *Young v. Mercantile Trust Company National Association*, 552 S.W.2d 247, 250 (Mo.App.1977), *Price v. Ford Motor Credit Company*, 530 S.W.2d 249, 253 (Mo.App.1975).

As an example of a service letter case wherein these rules where applied, appellant cites *Booth v. Quality Dairy Company*, 393 S.W.2d 845 (Mo.App.1965). In *Booth*,

the court ruled that defendant was entitled to an instruction telling the jury that if defendant made a good faith mistake about the necessity or requirement of issuing a service letter, punitive damages would not be proper. That case is clearly distinguishable from the case at bar, for here there is absolutely no question but that appellant knew it had to issue a correct letter. Even if one assumed that the logic of *Booth* would apply to good faith mistakes as to the truthfulness of a letter, there is no suggestion here that appellant sought an instruction so informing the jury.

Third, appellant also argues that the state of mind of the corporate agent who drafts the letter is the issue in determining malice. It cites *Van Sickle v. Katz Drug Company*, 235 Mo.App. 952, 151 S.W.2d 489 (Mo.App.1941), for support. In *Van Sickle*, the corporate agent who drafted the letter had been provided with the true reason for the plaintiff's discharge, but did not include that information in the letter. The court held that the drafting agent's intentional omission was sufficient to make a case on legal malice. Respondent correctly points out that the *Van Sickle* court's discussion of legal malice focused on the party charged. In this case it is the corporation, not its individual agents, that is charged with the wrongful act. Respondent correctly describes appellant's argument to be that if the drafting agent is innocent, the corporation cannot be held liable for punitive damages. He then cites *Price v. Ford Motor Credit Co.*, 530 S.W.2d 249 (Mo.App.1975), as rejecting a similar argument.

*Price* involved the repossession of plaintiff's car by one of the defendant's agents. Other agents erroneously informed the corporate defendant that plaintiff had defaulted in his payments. Acting on this incorrect information, agent Grasa was sent to repossess the car. Prior to the repossession, Grasa discovered information that the payments might be current and promised plaintiff that no action would be taken until he could investigate; Grasa did not do so and the repossession occurred. Malice was found in Grasa's failure to keep his promise not to repossess until he figured out what was going on.

The court said:

> . . . the fact that defendant's agent, Frank Grasa, did not know the taking was wrongful does not help defendant.
>
> \* \* \* \* \* \*
>
> The real thrust of defendant's argument is that the corporate defendant cannot be held liable for punitive damages because those agents of the defendant actively participating did not know they were mistaken in repossession. Even disregarding the fact that Grasa had to know he was violating the promise to withhold action when he permitted the repossession to occur, the corporate defendant is bound by the knowledge of all of its agents, and cannot make Grasa's actions proper by his ignorance of the true facts. Put another way, Grasa's misinformation, created by other agents' mistakes, does not avail the corporate defendant of the defense of good faith action.

*Id.* at 254.

In its reply brief, appellant admits that it is the corporate intent that counts and states that a corporation can only act and think through its agents. This is a particularly telling statement inasmuch as respondent introduced evidence that he was fired for reasons other than those stated in the service letter. This evidence suggested Kaelin remained very angry about the Marshall Scott/numbers game incident which was, in fact, the true reason for the dismissal. Such evidence being adduced and no mention of this incident being in respondent's personnel file, the jury could infer that Kaelin purposely left the information out of that file. This malice is imputed to appellant and the good faith of the letter drafter, Jim Beckett, is irrelevant. To hold otherwise would allow a corporation to avoid the imposition of punitive damages by simply having an innocent and ignorant agent draft the service letter. Such a situation would invite sham and duplicity and would eviscerate the service letter statute. The reasoning of the *Price* opinion would appear to be controlling on this issue.

■ The trial court's overruling of the motion for judgment n. o. v. was proper.

The burning issue presented is whether or not the service letter statute violates the first and fourteenth amendments to the Constitution of the United States. That question has been briefed and argued extensively both in this case and in *Lawrence A. Herberholt v. [d]ePaul Community Health Center, a corporation,* No. 62628, presently under submission. Such recent attacks on the statute obviously have stemmed from the memorandum opinion filed in *Rimmer v. Colt Industries Operating Corp.* by the U.S. District Court for the Western District of Missouri and now reported in 495 F.Supp. 1217 (1980), wherein it was declared that: ". . . the Missouri law presently applied in service letter cases violates both the due process clause and the equal protection clause of the Fourteenth Amendment." The predicate for the holding was that the statute adversely affects the free speech rights of *corporations* doing business in Missouri.

Before considering the merits of the constitutional challenges, two preliminary questions must be addressed: first, can the constitutional issues be raised for the first time on appeal; and secondly, what, if any, controlling precedential value is carried by the federal district court's opinion filed in *Rimmer* ?

■ First, it is beyond debate that constitutional questions are to be raised at the earliest possible moment. *Meadowbrook Country Club v. Davis,* 384 S.W.2d 611 (Mo. 1964). In this case, appellant did not advance one word about any alleged constitutional infirmity at any point prior to the appeal before the Eastern District of the Court of Appeals, the same court that met the same issue anew in *Herberholt.* Only one provision of our Rules of Civil Procedure allows this court to consider the issue. Rule 84.13(c), the plain error rule, allows this court to consider unpreserved errors resulting in a manifest injustice or a miscarriage of justice. Inasmuch as appellant is claiming an infringement upon the jealously protected right of free speech, it would appear that a full adjudication on the merits would be in order lest that infringement, if it exists, go unremedied.

■ Second, we must ask whether the memorandum opinion in *Rimmer* is binding upon this court in resolution of the instant case. We have not been cited to any case so holding. To the contrary, we note the holding in *Kraus v. Board of Education of City of Jennings,* 492 S.W.2d 783, 784–85 (Mo. 1973) that: "State court judges in Missouri are bound by the 'supreme law of the land,' as declared by the Supreme Court of the United States (Art. VI, Constitution of the United States.) We are not bound by general declarations of law made by lower federal courts. In *United States ex rel. Lawrence v. Woods,* 7th Cir., 432 F.2d 1072, 1075, 1076, cert. denied 402 U.S. 983, 91 S. Ct. 1658, 29 L.Ed.2d 148, the Court said: 'The Supreme Court of the United States has appellate jurisdiction over federal questions arising either in state or federal proceedings, and by reason of the supremacy clause the decisions of that court on national law have binding effect on all lower courts whether state or federal. On the other hand, because lower federal courts exercise no appellate jurisdiction over state tribunals, decisions of lower federal courts are not conclusive on state courts. * * * Of course in a given factual setting when a lower federal court has jurisdiction over the subject matter and the parties, its adjudication is the law of the case and its judgment is binding on all other courts, subject only to the appellate process. . . .' " See also *Rodgers v. Danforth,* 486 S.W.2d 258 (Mo. banc 1972). Notwithstanding the presence of an established legal principle, we do look respectfully to such opinions for such aid and guidance as may be found therein.

The constitutional issue has sparked an interest and we have not only the briefs of the parties but that of the Attorney General as intervenor and several amici. Those containing that the statute is unconstitutional advance few points of argument different from those in *Rimmer v. Colt Industries Operating Corp., supra,* and for that reason we must seek to analyze the reasoning therein.

## Due Process

Colt argued "that the present Missouri law in service letter cases is so vague that it violates the due process clause of the Fourteenth Amendment," and the district court agreed after finding that "the facts of [Rimmer] serve as an excellent example of the uncertainties in the existing . . . law." The conclusion reached was bottomed on the standard enunciated in *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972), that a statute is too vague when it "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden." The district court ruled that the statute does not specify adequately the circumstances under which a service letter is required. Emphasis was placed upon the first letter received by Colt, prior to termination of the employment, which the court found did not request a service letter stating the true cause for the discharge. Suffice it to say that we do note that the so-called first letter did request "the true cause for the 'present notification' of the discharge." Assuming the inadequacy thereof, however, there appears to be no explanation why the court disregarded a second letter from Rimmer asking for a description of his employment and the reason for his discharge as called for by the statute.

▮ Secondly, it was claimed by Colt, and the district court agreed, that the statute was vague because it did not specify the time limits within which an employer must provide the letter. The courts of this state have determined that an employer must reply within a "reasonable time," *Bubke v. Allied Building Credits, Inc.*, 380 S.W.2d 516 (Mo.App.1964), *Heuer v. John R. Thompson Co.*, 251 S.W.2d 980 (Mo.App.1952), and reasonableness should be measured by the facts of each case. If this flexibility is what the court found objectionable, we cannot agree.

▮ Thirdly, the statute was found overly vague because it allegedly provides no guidance as to what type of response constitutes a proper service letter. This notion appears to have been based upon the "true reason" language of the statute. After a brief factual recitation, the court found that it could not say that the letter did not state the true reason for the discharge of Rimmer. On this basis, it found the statute vague. Since the court had before it only the pleadings, it is not surprising that it could not with confidence rule as to the adequacy of the letter itself; but it seems rather extreme to rule, because of problems surrounding "one" letter, that the statute has not provided proper and sufficient guidance for corporate employers since the year 1905. We respectfully suggest that the statute is clear and concise in its dictates and any employer of reasonable intelligence would appreciate the obligations created by the statute. We find due process, in all of its aspects, to be met.

## Equal Protection

The more debatable issue before the district court was Colt's contention that the statute deprived it of equal protection of the laws as guaranteed by the fourteenth amendment because the statute, facially and otherwise, applied only to corporations. Recognition then was given to the fact that this court in *Cheek v. Prudential Insurance Company*, 192 S.W. 387 (Mo.1917) and the Supreme Court of the United States in *Prudential Insurance Company of America v. Cheek*, 259 U.S. 530, 42 S.Ct. 516, 66 L.Ed. 1044 (1922), upheld the constitutionality of this statute. However, the court observed that both cases were decided "prior to the time that the First Amendment was applied to the states through the Fourteenth Amendment" and that since only the "rational" basis test had been followed little precedential value remained. Thereafter, the court stated that a fundamental right of the corporate employer was involved and the "compelling state interest" test was applicable wherein a stricter scrutiny was appropriate. Thus, equal protection was denied because the statutory infringement of free speech affected only corporations and there was no substantial (governmental) state interest shown.

Believing that the threshold question before the district court, and now this court, was whether or not the service letter statute's requirement that a corporate employer speak the truth impermissibly infringes upon its rights of free speech, we seek briefly to outline the district court's rationale for holding that it did. The court framed the issue by saying: "The first question raised by defendant's motion for judgment on the pleadings is whether a false statement by a corporation concerning one of its past employees is entitled to First Amendment protection." Since the judgment was entered on the pleadings, the court necessarily had to assume the falsity of the statement as alleged. Thereafter, the court's answer was: "This Court comes to the firm conclusion that all statements in defendant's April 7, 1978, letter are entitled to the First Amendment protections announced by the Supreme Court in *Gertz*." [*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)].

*Gertz* is cited apparently for the proposition that even allegedly false statements are protected to some extent. *Gertz* went on to say that while the "actual malice" standard enunciated in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) did not apply to libel actions brought by private persons for actual damages, states could "not impose liability for defamation without some showing of fault" and that libel plaintiffs who could not prove actual malice could recover only actual damages. The district court interpreted the Supreme Court's silence on the factual application of the *Gertz* case to mean that the *Gertz* standards applied to actions between private entities as well as between a private person and a news agency. To reach this conclusion, the district court adopted Justice White's interpretation as expressed in his *dissent* in *Gertz*. The bottom line of this analysis is that no state can impose liability upon any legal entity, whether natural or artificial, private or public, for its allegedly false statements, unless the private plaintiff can prove fault in the utterance and actual injury resulting therefrom.

It is difficult to perceive how the requirement that a corporate employer speak *truthfully* is fundamentally different from other statutorily and judicially created rules and regulations compelling truthful expressions.

In the labor law area, it has been held that an employer's expressions relating to union activities are not without limits. In *N. L. R. B. v. Gissell Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court considered an employer's claim that its anti-union speeches were absolutely protected by the first amendment. Shortly after hearing of the unionization drive, the employer began efforts to dissuade his employees from joining the union. The employer stressed the harmful effect a strike would have on the company and employees alike and characterized the union as a "strike happy outfit." The employer also distributed pamphlets describing how other companies having the same union had gone out of business. The union lost the election and filed an unfair labor practice complaint. The Board trial examiner found that the employer's expressions constituted an unfair labor practice because they interfered with the employees' exercise of a free and untrammeled choice in the election. On appeal from this decision, the employer challenged the restrictions on its speech contained in the National Labor Relations Act as violating its first amendment rights.

While noting that § 8(c) of the Act, 29 U.S.C. § 158(c), guarantees an employer's right to freely express itself, the Supreme Court held that those expressions are not without limits. The Court held that statements containing threats of reprisal or force or promise of benefit are not protected because they tend to interfere with and coerce employees in their exercise of their right to free choice. The Court said:

> ... an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal of force or promise of

benefit.' He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the predication must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control or to convey a management decision already arrived at to close the plant in case of unionization. (citation omitted) If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable predication based on available facts but a threat of retaliation based on misrepresentation and coercion, and as such without the protection of the First Amendment.

*Id.* at 618, 89 S.Ct. at 1942.

Another first amendment challenge was raised in *Bausch & Lomb, Inc. v. N. L. R. B.*, 451 F.2d 873 (2nd Cir. 1971). In this case, the employer published a letter on the eve of a union election that stated that all present benefits given to employees would become subject to negotiation if the union were elected and *thus* might be lost. The union lost the election and filed an unfair labor practice complaint. The Board found an unfair labor practice in that the letter interfered with the laboratory conditions in which union elections are to be conducted. The employer appealed claiming that the Board's Laboratory Condition standard interfered with the employer's right of free speech.

The Court said:

There can be no question that outright misstatements or omissions which have the effect of misstatements, when considered by themselves, are not constitutionally protected. In discussing speech utilized as a tool for political ends, the Court has instructed that "the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which 'are no essential part of any exposition of ideas, and are of such slight value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality' ". (citation omitted)

We recognize that the Board's laboratory standards may have a minimal chilling effect on both the speech of the employer and the union. The parties vying for the votes of the employees may be reluctant to express themselves fully, fearing that an unintentionally false statement will be seized upon later in overturning an election. But the incidental effects of regulating on the rights of employer and union must be weighed against the interest of employees and the public at large in free, fair and informed representation elections.

*Id.* at 878–79.

What these cases indicate is that while an employer may speak fully if he speaks truthfully, he may not lie to his employees' detriment with impunity. In fact, fair dealing between employer and employee is the essence of the National Labor Relations Act. While these cases are not controlling in the situation presented by the service letter statute, they do state that employers are not free to say what they wish and still protect themselves with the shield of the first amendment. Both the N.L.R.A. and the service letter statutes stand as limits beyond which false employer speech will not be tolerated. The statute's mandate affects corporate rights of free speech no more than the plethora of state and federal statutes and regulations that require corporations to keep the governments to which they owe their existence appraised of their activities. Few are the cases raising first amendment challenges to tax, corporate or securities laws requiring corporations to speak truthfully. The compulsion to speak truthfully to a former employee would appear to be a small price to pay for the benefits gained by corporations, and their owners, for the enjoyment of their statutory franchises.

■ From all of which, we have concluded that any impact upon corporate rights of "free speech" created by the statute is inconsequential. There being no impermissible infringement upon a fundamental right, nor a showing of an unreasonable classification, equal protection questions are not for consideration. As said by the Supreme Court of the United Sates in *Prudential, supra,* at 259 U.S. 546, 42 S.Ct. 523:

> What more reasonable than for the legislature of Missouri to deem that the public interest required it to treat corporations as having, in a peculiar degree, the reputation and well-being of their former employees in their keeping, and to convert what otherwise might be but a legal privilege, or under prevailing customs a "moral duty", into a legal duty, by requiring, as this statute does, that when an employee has been discharged or had voluntarily left the service it shall give him, on his request, a letter setting forth the nature and character of his service and its duration, and truly stating what cause, if any, led him to quit such service.

> It is not for us to point out the grounds upon which the state legislature acted, or to indicate all the grounds that occur to us as being those upon which they may have acted. We have not attempted to do this; but merely to indicate sufficient grounds upon which they reasonably might have acted and possibly did act to show that it is not demonstrated that they acted arbitrarily, and hence that there is no sufficient reason for holding that the statute deprives the corporation of its liberty or property without due process of law.

Finding that § 290.140 is constitutional and an absence of trial error, the judgment should be and is hereby affirmed.

BARDGETT, C. J., and SEILER, and HIGGINS, JJ., concur.

DONNELLY, J., dissents in separate dissenting opinion.

RENDLEN, J., dissents and concurs in separate dissenting opinion of DONNELLY, J.

WELLIVER, J., dissents in separate dissenting opinion.

DONNELLY, Judge, dissenting.

In my view, *punitive* damages may not be recovered by a former employee under the authority of § 290.140, RSMo 1978.

The purported justification for the allowance of punitive damages is to punish a defendant and thereby deter it and others from subsequent malfeasance. *See* MAI No. 10.01. In § 290.140, *supra,* the General Assembly has opted for a criminal sanction to accomplish this *public purpose.*

I would reverse and remand with directions to enter judgment for respondent in the amount of One Dollar.

I respectfully dissent.

WELLIVER, Judge, dissenting.

I respectfully dissent.

While I feel no compulsion to be bound by the holding of the federal trial court, I am persuaded that the Missouri Service Letter Statute is unconstitutional for the reasons enunciated by Collinson, District Judge, in *Rimmer v. Colt Industries Operating Corporation,* 495 F.Supp. 1217 (W.D.Mo. 1980).

Following the rationale of *Rimmer* I would overrule any prior holdings of this Court to the contrary and would reverse the judgment of the trial court.